# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PXRE REINSURANCE COMPANY )
)
      Plaintiff, )
)
vs. )
)
LUMBERMENS MUTUAL CASUALTY )
COMPANY )
)
      Defendant, )
)
———————————————— )
LUMBERMENS MUTUAL CASUALTY )
COMPANY )
)
      Third-Party Plaintiff, )
)
vs. )
)
ALEA NORTH AMERICA COMPANY )
)
      Third-Party Defendant. )

Case No. 03 C 5155

Judge Shadur

Magistrate Judge Bobrick

DOCKETED
AUG 1 1 2004

FILED
JUL 2 9 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFF PXRE'S MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, IN SUPPORT OF A CONTINUANCE TO ALLOW FURTHER DISCOVERY PURSUANT TO RULE 56(f)

Plaintiff PXRE respectfully submits this memorandum of law in opposition to defendant Lumbermens' motion for summary judgment, and in the alternative, in support of a continuance pursuant to Fed. R. Civ. P. 56(f). Attached to this memorandum are the following supporting materials:

    1.    PXRE's statement pursuant to Local Rule 56.1;

    2.    Exhibits A – N to PXRE's Rule 56.1 Statement. Included within these exhibits are documents discovered within the Protected Portfolio's underwriting files demonstrating a pattern of conduct by Lumbermens which was inconsistent with affirmative representations made by Lumbermens during the placement of the Retro Treaty;

59

3.     The affidavits of Jeffrey Mayer and Robert Yenke (attached as Exhibits O and P to PXRE's Rule 56.1 Statement). These individuals were members of PXRE's pre-contract audit team, and their affidavits establish key facts in support of PXRE's claims, including PXRE's reasonable reliance on Lumbermens' misrepresentations and the practical limitations of PXRE's pre-contract review – limitations which were known, understood and counted on by Lumbermens to conceal its fraud;

4.     The affidavit of Gerald Radke (attached as Exhibit Q to PXRE's Rule 56.1 Statement), the Chairman and CEO of PXRE at the time the subject transaction was completed, reiterating that PXRE would not have entered into the Retro Treaty if Lumbermens had not made material misrepresentations or had not concealed key facts from PXRE's pre-contract audit team; and

5.     The affidavit of Kenneth R. Pierce, counsel to PXRE, (attached as Exhibit R to PXRE's Rule 56.1 Statement), in support of PXRE's alternative request pursuant to Rule 56(f) for a continuance of any decision on Lumbermens' motion until further discovery is completed.

For these reasons, and based on the authorities, affidavits and other evidence set forth below, Lumbermens' motion, whether characterized as a motion for summary judgment or for relief under Rule 16, should be denied in its entirety. In the alternative, the Court should postpone decision on Lumbermens' motion to enable PXRE to conduct further discovery, including the taking of certain depositions outlined below and in the Pierce Affidavit.

## I.     THE EVIDENCE SHOWS THAT LUMBERMENS COMMITTED FRAUD IN THE INDUCEMENT; AT A MINIMUM, THERE IS A GENUINE DISPUTE ON KEY MATERIAL FACTS WHICH PRECLUDES SUMMARY JUDGMENT AND RULE 16 RELIEF

The exhibits and affidavits attached to this memorandum establish that summary judgment dismissing PXRE's fraud claims, including the remedy of rescission, would be wholly inappropriate and contrary to well established principles under Rule 56 and Rule 16. The fraud claims that PXRE should be permitted to present to the trier of fact are set forth in Count II (fraudulent inducement), Count III (constructive fraud), and Count IV (negligent misrepresentation) of the Complaint. We do not address Count I (breach of the duty of utmost good faith) or Count V (breach of fiduciary duty) in this memorandum, in view of the Court's previous ruling that "no notions of _uberrimae fidae_ or fiduciary relationship are in play as between PXRE and

Lumbermens," (Mem. Op., May 21, 2004 at 9).[1]  <u>Accordingly, the present memorandum of law is confined to a traditional fraud analysis under Illinois law</u>.  To that end, the Court need look no further than the Affidavit of Jeffrey Mayer, the PXRE Executive Vice President who was responsible for investigating, underwriting, pricing and negotiating the Retro Treaty transaction, to see that there is substantial evidence supporting each element of a fraud-in-the-inducement claim under Illinois law, based on specific, affirmative <u>misrepresentations</u> made by Lumbermens.  Mr. Mayer testifies in his detailed, 25-page, 88-paragraph affidavit that:

1.      In soliciting PXRE, Lumbermens made specific, affirmative representations, both written and verbal, regarding Equus Re's underwriting approach, including its "cherry picking" of risks, its selection of risks based on their ability to generate a 7% return on surplus or greater, and its "full pricing" and actuarial-driven methodology for selecting and pricing risks on their own merits.  Mr. Mayer and Mr. Yenke explain these representations in detail, and they are also summarized below.  (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 25-47; Rule 56.1 Statement, Exh. P, Yenke Aff. ¶ 19);

2.      These representations by Lumbermens were material; and PXRE relied upon them in modeling, pricing and ultimately agreeing to be bound by the Retro Treaty.  (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 25);

3.      These representations were, in fact, false and misleading at the time they were made.  Mr. Mayer has now examined documents which have been produced in discovery.  In his affidavit, Mr. Mayer explains how these documents show that Equus Re had actually adopted an approach to underwriting that was contradictory to, and utterly inconsistent with, the methodology and practices it represented to PXRE that it had employed.  (<u>See</u> <u>id.</u> ¶¶ 48-65);

---

[1]      In a separate filing, PXRE is requesting reconsideration of the Court's decision regarding the applicability of utmost good faith to the reinsurance transaction at issue in this case.

4.      Given the scope, purpose and practical limitations of PXRE's pre-binding interviews and document review, which conformed to standard industry practice, it would have been improbable for PXRE to discover the documents establishing that Equus Re was actually misleading and defrauding PXRE (in Mr. Mayer's words, "akin to finding a needle in a haystack"). (See id. ¶ 75).[2]  We believe Lumbermens counted on those limitations to render it unlikely that PXRE would discover it was being defrauded.  In any event, under Illinois law, <u>Lumbermens had a duty to speak to correct its false and misleading statements and misrepresentations, regardless of whether it owed PXRE a fiduciary or other heightened duty.  It was not PXRE's duty to assume it was being defrauded and therefore spend enormous resources to find needles in haystacks and ferret out documents revealing the fraud;</u>

5.      The blatant inconsistencies between Lumbermens' representations and the true facts, as well as the circumstances surrounding the Retro Treaty transaction, reasonably give rise to an inference that Lumbermens' misrepresentations were made deliberately, with the intent to deceive PXRE.  (See id. ¶¶ 48-65).

6.      PXRE would not have entered into the Retro Treaty if it had known that Equus Re had underwritten contracts using an underwriting approach and methodology that was inconsistent with the affirmative representations made by Lumbermens and its agents, including former Equus Re personnel.  (See id. ¶ 67; "If I had known that Equus Re had repeatedly engaged in such 'loss-leading'-based underwriting rather than the approach it had represented, PXRE would not have bound the Retro Treaty"; Rule 56.1 Statement, Exh. Q, Radke Aff. ¶¶ 13-14).

In evaluating Lumbermens' motion for summary judgment (which was premature and therefore fails to address most of the evidence we have proffered), the Mayer, Yenke and Radke

---

[2]      See also Rule 56.1 Statement, Exh. P, Yenke Aff. ¶ 18.

affidavits must be taken as true, and all justifiable inferences must be drawn in PXRE's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## A. PXRE Has Proffered Evidence That Strongly Supports Each Element Of Its Fraud Claims Based On Lumbermens' Misrepresentations

In order to establish fraud under Illinois law, PXRE must show: (a) that Lumbermens made a misrepresentation of a material fact; (b) that Lumbermens knew the representation was false and intended to induce PXRE's reliance upon it; and (c) that PXRE reasonably relied and acted upon the misrepresentation to its detriment or damage. Havoco of Am., Ltd. v. Sumitomo Corp. of Am., 971 F.2d 1332, 1341 (7th Cir. 1992); see also Coca Cola Co. Foods Div. v. Olmarc Pkg'g Co., 620 F. Supp. 966, 973 (N.D. Ill. 1985). The attached affidavits and exhibits strongly support each of these elements.

### 1. Lumbermens' Representations of Material Facts

In soliciting PXRE to enter into the Retro Treaty, Lumbermens made both written and verbal representations to PXRE regarding Equus Re's approach and methodology in underwriting the Protected Portfolio. See PXRE's Rule 56.1 Statement ("Rule 56.1 Statement") at ¶ 40-45. As Mr. Mayer explains in his Affidavit, the written materials consisted of a Solicitation Letter (Rule 56.1 Statement, Ex. A), documents attached to that letter, including the Equus Re Presentation (Rule 56.1 Statement, Ex. B), and an actuarial report prepared for Lumbermens by Tillinghast-Towers Perrin (the "Tillinghast Report") (Rule 56.1 Statement, Ex. C). Verbal representations were made by Lumbermens' broker and agent, Lawrence Frank, as well as former Equus Re personnel including Lydia Kam, Elizabeth Sander and Daniel Anelante. (Rule 56.1 Statement, ¶¶ 43, 49, 66-68, 71-72).

- The Equus Re Presentation. The Equus Re Presentation, which was attached to the Solicitation Letter and delivered to PXRE on December 17, 1999, made a series of statements about

Equus Re, and, in particular, its underwriting approaches and methodologies, which were material to PXRE's decision to enter into the Retro Treaty. They include the following:

    (a)    Equus Re's "Strategic and Operational Tenets" included "Underwriting . . . Integrity" and "Selectivity – Cherry Picking";

    (b)    The "Portfolio Focus" was on "Profitability";

    (c)    Equus Re's management and underwriting team was, among other things, "Recognized [and] experienced" and had a "proven market following."

    (d)    Equus Re performed "disciplined, controlled underwriting";

(Rule 56.1 Statement ¶¶ 50-53; Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 26-30).

•    <u>The Tillinghast Report</u>. In addition to the Equus Re Presentation, Lumbermens' agent Pegasus provided PXRE with an independent actuarial analysis of the Protected Portfolio undertaken by Tillinghast, a large and highly regarded actuarial consulting firm which had been hired by Lumbermens. (Rule 56.1 Statement ¶ 56). The Tillinghast Report was furnished to PXRE as part of Lumbermens' solicitation effort – with the specific purpose of inducing PXRE to enter into the Retro Treaty. (<u>Id.</u>, ¶ 57). The report confirmed, among other things, that Equus Re's underwriting process was "very team-oriented, with multiple underwriters and actuarial input on most accounts," that "the pricing assumptions were generally very well documented," and that the overall expected loss ratio estimate for the Protected Portfolio was 75.0%. (<u>Id.</u> ¶ 60). <u>The Tillinghast Report made no mention of side deals, side arrangements, or risks not underwritten on their own merits, but for ulterior motives</u>. Mr. Mayer, who was a principal in a comparable actuarial firm and had participated in similar actuarial evaluations, regarded the Tillinghast Report to be a very significant document in connection with PXRE's evaluation of the proposed transaction: "The fact that an independent firm of Tillinghast's stature and reputation concluded that the loss ratio would be 75% and that Equus Re's underwriting process

included actuarial input, gave me comfort that Equus Re's representations in the Equus Re Presentation were accurate." (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 38).

- <u>Verbal Representations Made by Lumbermens' Agents</u>. In a telephone conversation that Mr. Mayer had with Mr. Frank shortly before he received the December 17, 1999 Solicitation Letter, Mr. Frank told Mr. Mayer that he drew "comfort" from the Tillinghast Report that Equus Re in fact had abided by the underwriting principles and approaches outlined in the Equus Re Presentation and described above. (Rule 56.1 Statement ¶ 57).

At the Pre-Binding Audit, which took place during February 10-11 and 14-15, 2000, Mr. Yenke spoke with Elizabeth Sander (the Equus Re Vice President and Pricing Manager). In his Affidavit, Mr. Yenke testifies that Ms. Sander explicitly stated that Equus Re did not reinsure any contract in the Protected Portfolio on which it had not anticipated at least a 7% return on surplus allocated to that particular contract. (Rule 56.1 Statement, Exh. P, Yenke Aff. ¶ 19). In addition, Mr. Mayer interviewed Lydia Kam, the President and Chief Operating Officer of Equus Re. Ms. Kam emphasized the "experience" and "excellence" of the Equus Re underwriting team and specifically stated that Equus Re's underwriting approach was "team oriented" and utilized a "full pricing" methodology. (Id. ¶ 68). Mr. Mayer understood Ms. Kam's reference to a "full pricing" methodology, in conjunction with the written representations he had received, to mean that Equus Re priced risks on their own merits, and that Equus Re did not employ "loss-leader"-based underwriting, or enter into transactions that would generate losses in return for side deals or side promises of future profitable business. (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 44).

During the Pre-Binding Audit, other members of the PXRE team spoke with Daniel Anelante, the Equus Re Senior Vice President and Director of Underwriting Operations, who made statements to the PXRE team regarding Equus Re's underwriting approach and methodology that were the same or similar to Ms. Kam's. (Rule 56 Statement ¶¶ 71-72).

The Solicitation Letter, the Equus Re Presentation, the Tillinghast Report, and the verbal statements made by Mr. Frank, Ms. Kam, Ms. Sander and Mr. Anelante, separately and taken together, constituted <u>specific and affirmative representations</u> to PXRE that :

- Equus Re carefully selected ("cherry picked") the lines of business and types of reinsurance contracts that it would consider writing, based on the potential for those lines or contracts to generate a profit;

- Equus Re had a profit expectation of 7% return on surplus or greater for each contract it wrote;

- Equus Re reinsured risks after a disciplined underwriting review, including the participation of actuaries and other members of an "integrated team," concluded that the particular risk, on its own merits, would generate a profit ("disciplined, controlled underwriting," per the Equus Re Presentation; "full pricing" per Ms. Kam); and

- This approach and methodology constituted the "Strategic and Operational <u>Tenets</u>" of Equus Re.

(Rule 56.1 Statement ¶ 73). In particular, these written and verbal statements constituted representations to Mr. Mayer that Equus Re had <u>not</u> employed a "loss-leader"-based approach to underwriting, in which Equus Re compromised its underwriting standards for the purpose of ingratiating itself or building relationships with brokers or ceding insurers with the hope of a future payoff (sometimes reflected in side deals or side agreements).

### 2. The False and Misleading Nature of Lumbermens' Material Representations

The foregoing representations by Lumbermens, set forth in more detail in the Rule 56.1 Statement at ¶¶ 41-68, were false and misleading at the time that they were made. As reflected in the documents attached as Exs. F - K, which are described in detail in Mr. Mayer's Affidavit at ¶¶ 52-64, Equus Re had in fact adopted a "loss-leader" approach to underwriting that was utterly inconsistent with the above mentioned representations. Instead of "disciplined and controlled underwriting," and the meticulous analysis of individual risks on their own merits, Equus Re consistently and intentionally entered into reinsurance transactions that it knew or believed would be unprofitable, for the purpose of ingratiating itself or building relationships with brokers or ceding

insurers who, in side deals or side arrangements, would promise or guarantee future profitable business.

- _Lexington/Thor_. The transaction that has received the most attention in this case thus far, the Lexington/Thor transaction, goes beyond the loss-leader-based underwriting discussed above, and may constitute assistance by Equus Re in dishonesty and accounting irregularities. When Lexington originally presented the Thor transaction to Equus Re, <u>Equus Re's actuary concluded that it would generate significant losses</u>. (Rule 56.1 Statement ¶ 78). Equus Re ultimately agreed to accept this known, money-losing contract in December 1998 – and to back-date the reinsurance contract's inception date to July 1, 1998 – in return for Lexington's agreement to cede to Equus Re all of Lexington's property and casualty business until Equus Re was paid back and, in addition, reached a 10% profit margin, at which time the "side agreement" would be commuted automatically, thus locking in the 10% profit to Equus Re. (<u>Id.</u> ¶ 80).

Thus, the indisputable documentary record reveals that Equus Re accepted the Thor account knowing that it would perform poorly and generate significant losses – conduct that is blatantly inconsistent with the aforementioned representations regarding Equus Re's underwriting methodology. Moreover, Equus Re knew that Lexington expected to incur a loss, but apparently wished to use the device of a back-dated reinsurance agreement to mitigate the impact of this known loss on its financial statements for the second half of 1998. The fact that Lexington <u>guaranteed</u> a 10% future profit to Equus Re indicates that Lexington was willing to go so far as to pay a price to Equus Re (<u>i.e.</u>, incur a loss or liability in the future) in order to avoid or mitigate the loss which had been incurred by Lexington between July and December 1998. (Rule 56.1 Statement ¶¶ 81-82).[3] In any event, as Lumbermens and Equus Re well knew, the Retro Treaty

_____

[3]    We have referred to the Thor Side Agreement as "shocking" in prior submissions to the Court because it is just that. Reinsurance is a tool allowing ceding companies to transfer risk, and there are strict accounting guidelines that apply to reinsurance. <u>Reinsurance is not intended to be a device to enable ceding insurance companies to shift a known, incurred loss from one accounting period to another</u>. While we have

transaction shifted this money-losing business to PXRE, while the future guaranteed profit would inure to the benefit of the former Equus Re employees in their new business at Alea.

In addition to Lexington/Thor, the other instances of side deals and loss-leader-based underwriting, described more fully in Mr. Mayer's affidavit, include the following:

- <u>Wellington Syndicate 2020</u>. (Rule 56.1 Statement ¶¶ 83-84; Ex. G). In this transaction, Equus Re specifically acknowledged that the contract was under-priced, but entered into it anyway because the broker "needs a favour" and "are stuck" because "they have used all their favours placing the programme."

- <u>Houston Casualty Property Quota Share</u>. (<u>Id.</u> ¶¶ 85-86; Ex. H). In this transaction, Equus Re rejected the contract, and even wrote a letter detailing seven different "reasons for passing" on this risk. It then decided to enter into the transaction as a *quid pro quo* for being shown future business by HCC and to "to become one of its core reinsurers in the future."

- <u>Hiscox Syndicate</u>. (<u>Id.</u> ¶ 87; Ex. I). Equus Re declined this account because it concluded "this was too low an attachment [point]." Equus Re then reversed course and accepted the risk "as part of [an] overall relationship with the Group (Syndicate and Insurance Co.)."

- <u>Euclidian Syndicate</u>. (<u>Id.</u> ¶ 88; Ex. J). Equus Re's underwriting notes reveal that it concluded that the offered rate was "thin" on this new property account, and that it "would not renew next year unless the price changed." Notwithstanding its apparent dissatisfaction with the rate offered for this risk, Equus Re agreed to accept it, "presum[ing] that we hope to get other opportunities from the Syndicate."

- <u>Caliber One</u>. (<u>Id.</u> ¶ 89; Ex. K). Equus Re's underwriter regarded this account as "underpriced" and had been "declined . . . several times . . . due to our dissatisfaction with the current pricing." Equus Re continued to believe that the account was not attractive, but decided to write it as an "accommodation" to Aon's Boston office, a "major supporter of Equus' property department" and with which Equus Re saw "a strong future ... relationship."

### 3. <u>Materiality and PXRE's Detriment</u>

Under Illinois law, a statement's falsity is determined at the time that it was made, and materiality is determined by assessing whether the plaintiff would have acted differently if it had known the true facts. <u>Semmens v. Semmens</u>, 396 N.E.2d 1282, 1286 (Ill. App. Ct. 1979).

---

no direct evidence that this is what the Thor side deal was intended to accomplish, to Mr. Mayer, "[i]t appears ...to be such a device" based on the documents attached in Ex. F. (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 57). Discovery may well shed further light on this issue.

There is no question that if PXRE had seen the Thor Side Agreement, or if the former Equus Re personnel who PXRE interviewed had told PXRE about it, then "PXRE would not have bound the Retro Treaty." (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 67; Rule 56.1 Statement, Exh. Q, Radke Aff. ¶ 13). As Mr. Mayer testifies:

> First, PXRE would not have wanted to enter into a transaction with a company that had engaged in a pattern of conduct that was inconsistent with its statements and representations.

> Second, in any event, PXRE would have no interest in a book of business that was based on building relationships rather than "disciplined, controlled underwriting."

> And third, because the loss-leading-based underwriting approach adopted by Equus Re involved a trade-off of losses today for a payoff in future years, a serious question would have emerged about whether the Retro Treaty transaction was an effort to offload the money-losing contracts entered into in order for the Equus Re personnel to build relationships with brokers and ceding insurers, while these same individuals would be reaping the benefits of these relationships when they continued their business at Alea.

(Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 68-70). Thus, the Thor Side Agreement alone would have ended any interest by PXRE in pursuing the Retro Treaty transaction. But the Thor Side Agreement is not the only example of such underwriting malfeasance. That transaction, together with the other transactions described above, reveal a pattern of conduct that was completely inconsistent with Equus Re's statements and representations about its underwriting approach and methodology.

In sum, Lumbermens made a series of false and misleading statements and representations, relied upon by PXRE, and which have caused PXRE significant harm because they induced PXRE to enter into the Retro Treaty. There can be no doubt that those statements and representations would have been material to any reasonable reinsurance underwriter. Indisputably, they were material to PXRE. As Mr. Mayer testifies, Lumbermens' statements and representations played a "fundamental and critical" role in PXRE's ability to evaluate, model and price the Retro Treaty transaction. (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 20). As Mr. Mayer and Mr. Radke

testify, PXRE would not have entered into the Retro Treaty transaction had they known the true facts.[4]

### 4.     Lumbermens' Knowledge and Intent

The evidence we have proffered is more than sufficient for the trier of fact to infer that Lumbermens' fraudulent conduct was knowing and deliberate.   The blatant inconsistencies between Lumbermens' representations about Equus Re's approach to underwriting and the true facts regarding Equus Re's underwriting methodology are more than sufficient to give rise to an inference that Lumbermens knew it was likely that the loss ratio would greatly exceed 75% and that Lumbermens' statements and representations about Equus Re's underwriting in the Equus Re Presentation were made with the intent to deceive PXRE.   Since Lydia Kam was the President of Equus Re, it is reasonable to assume that she knew that her statements about "full pricing," and that Equus Re's approach to underwriting was consistent with the principles set forth in the Equus Re Presentation were false.[5]

Moreover, as Mr. Mayer observes, because the loss-leader underwriting approach adopted by Equus Re involved a trade-off of losses today for a payoff in future years, Lydia Kam and the other Equus Re personnel interviewed during the Pre-Binding Audit had a motive to conceal what they had done.   The Protected Portfolio contained the loss-leading business placed by the Equus Re personnel to build relationships with brokers and ceding insurers.   These same individuals stood to reap the benefits of these relationships when they continued their business at Alea.   Of course, none of those benefits would be shared with PXRE.

---

[4]     We emphasize that at this juncture PXRE has yet to take a single deposition.  It is quite plausible that additional examples of side deals or other underwriting malfeasance will be exposed when PXRE deposes the former Equus Re personnel.

[5]     PXRE therefore also meets the lower threshold for stating a claim for constructive fraud.  See In re Estate of Neprozatis, 378 N.E.2d 1345, 1349 (Ill. App. Ct. 1978) (constructive fraud is a "breach of legal or equitable duty which . . . the law declares fraudulent because of its tendency to deceive others").

Illinois courts have long held that claims involving motive and intent, such as fraud claims, which are generally "not subject to direct proof," Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 918 (7th Cir. 1974), are "peculiarly inappropriate for disposition on a motion for summary judgment." Askew v. Bloemker, 548 F.2d 673, 679 (7th Cir. 1976). At a minimum, given the abundant evidence we have proffered, PXRE should be afforded the opportunity to take the depositions of those Lumbermens officials and agents involved in the solicitation of PXRE regarding the issues of motive and intent.

### B. PXRE Has Proffered Evidence That Strongly Supports Its Claim Based On Lumbermens' Nondisclosures

As Lumbermens itself admits in its memorandum in support of summary judgment, under Illinois law a party can maintain a fraud claim based on the failure to speak – even where there is no fiduciary or other special duty – "when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension." Coca Cola, 620 F. Supp. at 973 (emphasis added). The evidence we have proffered establishes that Lumbermens created – through its representations and its proffer of the Tillinghast report as accurately representing the book of business to be reinsured – PXRE's misapprehension that Equus Re employed a "full pricing," actuarial-driven underwriting methodology to price risks on their own merits. Lumbermens knew that it would have been virtually impossible for PXRE to uncover, in a pre-binding audit, the documents revealing that Lumbermens' representations were false. But Lumbermens failed to correct this misapprehension. As Mr. Mayer testifies:

> At no time during or after the interview did Ms. Kam ever state or suggest to me, or refer me to documents that would have indicated that, Equus Re had in fact adopted an underwriting approach and business practice that was inconsistent with the Equus Re Presentation, the Tillinghast Report and her own statements.

(Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 45). In particular:

Lumbermens emphasized the Tillinghast Report as a "positive point" for PXRE to consider, when the facts suggest that Lumbermens knew that report was inaccurate. (Id. ¶ 71).[6]

In its memorandum in support of summary judgment, Lumbermens draws a comparison between the Retro Treaty and facultative reinsurance (i.e., the reinsurance of a single policy or risk) because the Retro Treaty transaction involved the reinsurance of a book of already-written business, rather than the cession of risks to be written in the future. This is an absurd comparison. In facultative reinsurance contracts, which often involve property insurance on a single large commercial structure, the reinsurer has the time and the opportunity to review the engineering study and other information material to the single risk being reinsured. Here, PXRE had three or four days to review hundreds of treaties involving thousands of underlying risks. If anything, the fact that the Retro Treaty involved a closed book of contracts buttresses PXRE's point. The Equus Re underwriters knew what was in the book – they knew full well the pattern of conduct they had engaged in and that it was inconsistent with their statements and representations. If the treaty had involved the prospective cession of risks, the Equus Re personnel may have had an excuse for not correcting their misrepresentations, because they could say that any statements about what was in the book would be forward-looking and a mere prediction. Here, they have no such excuse. They had already entered into transactions that were inconsistent with Lumbermens' statements and representations. They knew they had engaged in loss-leading underwriting; they knew that PXRE was assuming that business; and they concealed what they had done.

In sum, the documents discussed above, which would have revealed Lumbermens' true approach to underwriting, were time bombs buried within hundreds of thousands of pages. PXRE had no reason to suspect they existed at the time the Retro Treaty was bound. It was not

---

[6]     There is no evidence that Tillinghast knew of the Thor Side Agreement or the other side arrangements set forth in this brief. As Mr. Mayer has concluded, "if Tillinghast had been made aware of the Thor Side Agreement or the arrangements described above, I believe it should have reached a different conclusion." (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 71).

until several years later, in 2003, when the loss projections on the Protected Portfolio indicated a loss ratio greatly in excess of PXRE's estimates, that PXRE returned to Alea for a thorough inspection of the underwriting files. This lawsuit was filed very shortly after PXRE's Chief Financial Officer stumbled upon the Thor Side Agreement in June 2003. Under these circumstances, Lumbermens' failure to correct PXRE's misapprehension constitutes fraud under Illinois law. Coca Cola, 620 F. Supp. at 973.

### C. PXRE Could Not Have Been Expected To Assume It Was Being Defrauded And Ferret Out The Documents Revealing The Fraud

A key question the Court has emphasized in prior status conferences is whether PXRE should have discovered it was being defrauded prior to binding the Retro Treaty because documents that were contradictory to Lumbermens' affirmative representations allegedly were made available for inspection. As discussed below, the files PXRE selected for its pre-binding review were not those containing documents that would have revealed the fraud, and PXRE could not have been expected to review every piece of paper in every additional file to confirm that what it had been told and what it had seen in a reasonable sampling of files was in fact false.

First, at the Pre-Binding Audit, PXRE never actually reviewed any of the files it has now discovered to have been written not on actuarial underwriting principles but based on side deals and accommodations. Thus, PXRE did not actually learn of the Thor Side Agreement, or the other side agreements discussed herein, during the pre-binding review of files. (See Rule 56.1 Statement, ¶¶ 48, 77-89). As Mr. Mayer explains:

> Lumbermens did not afford PXRE the time or the opportunity to review each document in each file. There were approximately 350 different reinsurance treaties in the Protected Portfolio. The underwriting and claim files for these treaties were extremely voluminous, amounting to over 200,000 pages. Prior to going to Alea, I was told by Mr. Frank that PXRE would only have three or four days to complete our interviews and document review. It obviously would have been physically impossible for PXRE's team to examine each document in each file over that period of time.

(Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 24). Accordingly, PXRE did an on-site pre-binding review consisting of interviews with key personnel and a review of a sampling of underwriting files. PXRE advised Lumbermens of the files it would review during its visit. While the remainder of the underwriting files may theoretically have been "available," as a practical matter PXRE would have been unable to review more than a handful of them, at most, given the short duration of the visit.

Second, given the scope, purpose, and practical limitations of the Pre-Binding Audit, it would have been improbable for PXRE to have discovered even a single document revealing the false and misleading nature of Lumbermens' representations -- and Lumbermens knew it. As Mr. Mayer states:

> Even if Lumbermens had afforded PXRE more time, it would have been economically infeasible for PXRE – or any reinsurer – to devote the time, expense and resources that would have been involved in an examination of each document in the Protected Portfolio files. Reinsurers are not expected or required to duplicate the underwriting conducted by the ceding insurer on every risk being reinsured, especially here, where the transaction involved approximately 350 reinsurance contracts involving thousands of underlying insureds. In my experience, reinsurers instead generally adopt the approach that we adopted: interviews and discussions with key ceding company personnel, review a sampling of documents and review internal and/or external actuarial reports.

> Accordingly, it would have been inconsistent with standard reinsurance industry practice for PXRE to examine each and every document in the Protected Portfolio files. My expectations concerning a cedent's obligations to make truthful disclosures about and accurate representations of its business, including the manner in which it underwrites its business, are in no way diminished or compromised in transactions involving so-called "closed blocks" or the cession of risks on business that had already been bound by the ceding company. I have never been involved in a reinsurance transaction in which the reinsurer was expected to examine each and every document in a ceding company's files. In my opinion, it is unheard of for a reinsurer to be expected to undertake such a review.

> Even if I had been given the files for the contracts that I have now reviewed revealing conduct by Equus Re that is materially inconsistent with Equus Re's affirmative representations regarding its underwriting, it is uncertain whether PXRE's Pre-Binding Audit team would have located the documents revealing those inconsistencies. This is because the focus of PXRE's Pre-Binding Audit was on such matters as identifying Equus Re's overall pricing philosophies and methodologies, and the types of business (e.g. auto liability, medical malpractice) Equus Re wrote. The Pre-Binding Audit team did not, and was not intending to, study in detail every

piece of underwriting correspondence, e-mail and communications to brokers in each of the files that was reviewed.

(Id.). In short, it cannot be held as a matter of law that PXRE "should have" found the documents under the factual circumstances of the Pre-Binding Audit.[7] Moreover, to assert that PXRE should have assumed it was being defrauded and should have discovered Lumbermens' fraud, is to reverse the parties' respective burdens and obligations under Illinois law. Coca-Cola, 620 F. Supp. at 673.

### D. PXRE Has Proffered Evidence That Strongly Supports Its Claim For Rescission

There is absolutely no reason or basis under Rule 16 or otherwise to disallow PXRE's prayer for rescission as a remedy, or (as we predict Lumbermens will urge) to limit PXRE's remedy to the damages caused by the specific treaties which utilized underwriting methods which were inconsistent with Lumbermens' representations. The affidavits of Mr. Mayer and Mr. Radke could not be clearer: Had PXRE known the truth regarding Equus Re's approach, and more importantly, had PXRE known that Equus Re's underwriting approach was inconsistent with the affirmative representations it had made during the solicitation, the Retro Treaty never would have been bound. (See Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 66-71; Rule 56.1 Statement, Exh. Q, Radke Aff. ¶¶ 13-14). Rescission is indisputably a remedy available in Illinois to parties fraudulently induced to enter a contract under these circumstances. This was acknowledged as early as 1908 in Prentice v. Crane, 84 N.E. 916, 918 (Ill. 1908), and the availability of rescission in fraud cases has been recognized and restated in recent Illinois cases, such as Rezin v. Brust, No. 03 C 383, 2003 WL 22494942, at **6-7 (N.D. Ill. Nov. 4, 2003). PXRE's proffered evidence clearly meets each element of a rescission claim.

---

[7]    Indeed, we do not even know whether documents were removed from the files prior to PXRE's pre-binding review. Thus, there is no factual basis for summary judgment on the ground that PXRE "should have" discovered the evidence of Lumbermens' fraud.

**E.  PXRE Has Not Waived Its Fraud Claims; In
Any Event, There Is A Genuine Dispute On
Facts Which Are Material To The Question Of Waiver**

It would have been highly unlikely for PXRE to discover the documents revealing

Lumbermens' fraud in the post-binding claim audits conducted after the Retro Treaty was executed

in April 2000.  The post-binding audits had a completely different purpose, scope and focus than the

Pre-Binding Audit discussed above.  (Rule 56.1 Statement ¶ 100).  As Mr. Mayer explains, the Pre-

Binding Audit involved a review of <u>underwriting</u> files (i.e., the documents analyzing, evaluating

and quantitatively assessing whether Equus Re would take on a risk).  (Rule 56.1 Statement, Exh.

O, Mayer Aff. ¶ 77).  The post-binding claim audits, however, were focused on <u>claim</u> files (i.e.,

claims being submitted by ceding insurers pursuant to the reinsurance contracts in the Protected

Portfolio).  (<u>Id.</u>).

Lumbermens' main waiver argument is that, by virtue of an August 7, 2000 e-mail

from Cary Stone of Lumbermens (Ex. L), allegedly making reference to the side agreement between

Equus Re and Lexington on the Thor account, PXRE was put on notice of the Thor Side

Agreement.  This argument is unavailing.

First, since Lumbermens filed its summary judgment motion prematurely, prior to

learning about the other side deals and loss-leader underwriting discussed above (as it would have

learned in depositions of PXRE), its waiver argument is confined to the Thor Side Agreement and

does not address the evidence we have now proffered of a <u>pattern</u> of underwriting inconsistent with

the placing representations.  For that reason alone, its waiver argument must be rejected – the record

in this case has superceded Lumbermens' argument.

But even assuming that the Thor Side Agreement were the only instance of

misrepresentation and concealment by Lumbermens, Lumbermens' waiver argument still could not

possibly prevail on summary judgment because it involves hotly contested questions of fact.

Waiver is a matter of intent, and requires full and actual knowledge of the facts.  See, e.g., <u>Sphere</u>

Drake Ins. Ltd. v. All Am. Life Ins. Co., 300 F. Supp. 2d 606, 629 (N.D. Ill. 2003) ("waiver cannot occur until the waiving party first has knowledge of its right"), aff'd, No. 03-3750, 2004 WL 1588084 (7th Cir. July 16, 2004); Jacksonville Hotel Bldg. Corp. v. Dunlap Hotel Co., 264 Ill. App. 279, 1931 WL 3222, at **19-20 (Ill. App. Ct. 1931) ("'It is essential to a valid waiver that the party sought to be charged with the waiver had knowledge of what the other party had done contrary to the terms of the contract. . . .' The party claiming a waiver has a burden of proving it . . .") (citation omitted); accord Hakala v. Illinois Dodge City Corp., 380 N.E.2d 1177, 1184 (Ill. App. Ct. 1978) ("It is necessary to know that a wrong has been done or a mistake made before one can 'sleep' on his right to have that wrong requited or the error corrected").

Thus, generally, whether a party has waived its right to seek rescission is a question of fact which is not resolvable on summary judgment. See Havoco of Am., Ltd. v. Hilco, Inc., 731 F.2d 1282, 1292 (7th Cir. 1984) (disputed issue of material fact as to intent precluded summary judgment on ground of waiver); Golden Rule Ins. Co. v. Schwartz, 786 N.E.2d 1010, 1016-17 (Ill. 2003) (open questions of fact as to whether insurer would have issued a policy had it known the true facts and as to insured's intent in omitting information precluded summary judgment); Brandt v. Time Ins. Co., 704 N.E.2d 843, 848-49 (Ill. App. Ct. 1998) (question of fact as to imputed knowledge of preexisting condition as basis to rescind an insurance policy precluded summary judgment); Hilliard v. Woodmen of the World Life Ins. Soc'y, 71 N.E.2d 903, 907 (Ill. App. Ct. 1947) ("'It is always a question of fact. . . . What facts will constitute a waiver . . . is a matter of law, but whether the facts exist in any given case is a question of fact'") (citation omitted).

Here, there is absolutely no factual basis for Lumbermens' assertion that Cary Stone's August 2000 email put PXRE on notice of the Thor Side Deal to justify a finding of waiver as a matter of law. First of all, Ms. Stone's e-mail mischaracterizes the Thor Side Deal and omits any mention of its most significant and egregious aspect. She states that "in exchange for priorities to use Equus on two other programs (which also turned out to be bad, but not as bad), Equus agreed

to write a 25% share" of the Lexington contract. (Rule 56.1 Statement ¶ 102; Ex. L at PXRE 006420). However, the true nature of the Thor Side Deal, as set forth in Carol Correia's December 21, 1998 memo – to which Ms. Stone did <u>not</u> refer in her e-mail – was that Lumbermens was to continue being "paid back" through cessions of future Lexington business until it reached a 10% profit margin on that business, at which time the arrangement would be commuted automatically. Nor does Ms. Stone's e-mail even hint that Equus Re knew the Thor business was unprofitable when written. As Mr. Mayer explains (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶ 85), Ms. Stone's statement, combined with other statements in her e-mail, suggest <u>either</u> that Ms. Stone was as mystified as PXRE as to the reasons for the poor performance of the Thor account, <u>or</u> was concealing the fact that Equus Re accepted a known loss-generating deal, back-dated the contract, and was guaranteed a future reward on an unrelated contract.

Furthermore, Ms. Stone's August 2000 cover e-mail to PXRE, which encloses the report upon which Lumbermens relies, states that "based on our conversation, I am sending around the attached draft of a report at Kemper. . . . <u>Per our conversation nothing alarming seen</u>" (Ex. L at PXRE 006416; emphasis added). As Mr. Mayer testifies, since the Thor Side Agreement is extremely alarming, Ms. Stone <u>either</u> never saw or read it, <u>or</u> read it, and attempted to mislead or distract PXRE from appreciating its significance by stating that "nothing alarming" was seen.[8]

We look forward to taking Ms. Stone's deposition to determine how she can possibly reconcile her statement about "nothing alarming" with the written Thor Side Agreement. In any event, her e-mail clearly and obviously did <u>not</u> put PXRE on notice of the side deal to constitute waiver as a matter of law. (Rule 56.1 Statement ¶¶ 102-07). Lumbermens itself states the "black letter law in Illinois" that waiver of the right to rescind a contract applies only when a person "<u>after</u>

---

[8] Subsequent correspondence by Ms. Stone, which furthered PXRE's belief that the poor Lexington results were the product of chance, not deliberate underwriting, is summarized in Mr. Mayer's affidavit at ¶¶ 86-87.

discovering the untruth of the representations, conducts himself with reference to the transaction as though it were still subsisting and binding." (S.J. Br. at 18; emphasis added). It is undisputed that PXRE lacked actual knowledge of the Thor Side Deal in August 2000. (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 81-85).

Lumbermens further argues that PXRE's receipt of the August 2000 e-mail "as a matter of law, amounts to actual knowledge of any additional facts PXRE could have gained upon a review of the full underwriting file" for the Thor contract, because a party can be charged with waiver where it did not have full knowledge of the facts but did have knowledge of sufficient facts as to trigger a duty of inquiry. (S.J. Br. ¶ 18).[9] However, the Stone e-mails would not put a reasonable reinsurer on notice of anything untoward in the underwriting of the Lexington contract. But even assuming, for purposes of argument only, that there were an issue whether PXRE had the requisite knowledge from the August 2000 e-mail to trigger a duty of inquiry, that would be a classic question of fact requiring discovery as to what message was reasonably conveyed by the Stone e-mail.[10]

---

[9] The cases Lumbermens cites for this proposition are either irrelevant or support PXRE's position. Significantly, of the four cases Lumbermens cites – Foremost Guaranty Corp. v. Meritor Savings Bank, 910 F.2d 118 (4th Cir. 1990); Supreme Lodge Knights of Pythias of the World v. Kalinski, 163 U.S. 289 (1896); Rutherford v. John Hancock Mut. Life Ins. Co., 562 F.2d 290 (4th Cir. 1977) and Major Oil Corp. v. Equitable Life Assur. Soc'y of U.S., 457 F.2d 596 (10th Cir. 1972) - (i) none are Illinois cases, or even in the 7th Circuit; (ii) all were decided after a full trial on the merits; and (iii) all are factually inapposite. In Foremost, Supreme Lodge and Major Oil, plaintiffs all had received actual notice of the facts and were thus chargeable with knowledge of them. In Rutherford, the court found no waiver by a life insurer where the insured failed to disclose a history of alcoholism, stating "the critical factor upon which a duty of further inquiry must be based is not simply the means to inquire, but the existence of a reason for doing so. The means to conduct an investigation obviously exist in almost every case, but even insurance companies could hardly operate if they were required as a matter of law to look behind the face of every innocent-appearing application." 562 F.2d at 293-94.

[10] Lumbermens goes even further, claiming that PXRE waived not only its right to seek rescission, but also its right to seek any affirmative relief. Since Lumbermens' assumption is that PXRE's claim is based on nondisclosures rather than affirmative misrepresentations, the testimony in the attached affidavits have rendered it moot. In any event, under Illinois law, to find waiver of any relief at all, "[a]n additional and essential element is that the injured party intend to affirm the contract and intend to abandon his right to recover damages for the loss resulting from the fraud. The added element of intent places a heavier burden upon the party asserting the waiver." Lee v. Heights Bank, 446 N.E.2d 248, 254 (Ill. App. Ct. 1983) (emphasis in original). In Kaiser v. Olson, 435 N.E.2d 113 (Ill. App. Ct. 1981), the court stated the rule that

In sum, Lumbermens has failed as a matter of law to meet its burden of showing waiver. At the very minimum, disputed factual issues preclude the grant of summary judgment on this issue.

**F.      The Presence Of An Integration Clause In The Retro Treaty Does Not Affect PXRE's Fraud Claims**

Lumbermens' argument regarding the applicability of the integration clause is addressed to PXRE's claims under Counts I (breach of the duty of utmost good faith) and V (breach of fiduciary duty). (S.J. Br. at 14-16). <u>Lumbermens does not argue that PXRE's fraud claims are barred by the integration clause, nor could it</u>. The general purpose of integration clauses such as the one in the Retro Treaty is to preclude a contracting party from introducing parol evidence to vary or modify the unambiguous terms of a written agreement. <u>See</u>, <u>e.g.</u>, <u>Echo, Inc. v. Whitson Co.</u>, 52 F.3d 702, 707 (7th Cir. 1995).

As this Court expressly recognized in its May 21, 2004 Memorandum Opinion, an integration clause does not preclude a party from seeking to rescind a contract by virtue of the other party's misrepresentations or nondisclosures in procuring the contract: "This Court of course recognizes, as it has consistently said during the course of this proceeding to this point, that proof of fraud in the inducement of the parties' contract would necessarily prevail as against Lumbermens' reliance on one of the provisions of what would then have been shown to be a fraudulently-induced contract." (Mem. Op., May 21, 2004 ¶ 6); <u>accord</u> <u>Rosenthal & Co. v. Rosario</u>, No. 86 C 2922, 1990 WL 51182, at **6-7 (N.D. Ill. Apr. 16, 1990) (extrinsic evidence admissible to establish fraud in the inducement of brokerage contract); <u>GE Credit Auto Lease, Inc. v. Jankuski</u>, 532 N.E.2d 361, 365

---

waiver of the right to sue for damages for fraud "will apply if a party, after discovering the alleged fraud, <u>and</u> <u>with full knowledge of its material aspects</u>, engages in conduct which is inconsistent with an intention to sue." <u>Id.</u> at 118 (emphasis added). The facts are clear that PXRE did <u>not</u> have "full knowledge of the material aspects" and did <u>not</u> intend to relinquish its right to sue for fraud. (Rule 56.1 Statement, Exh. O, Mayer Aff. ¶¶ 81-87). And if Lumbermens disagrees with Mr. Mayer's testimony in this regard (which must be assumed as true for purposes of its summary judgment motion) it will be free to argue its points to the trier of fact. But such a highly disputed, fact-intensive issue is hardly appropriate for summary judgment.

(Ill. App. Ct. 1988) (parol evidence may be introduced to show a fraudulent scheme inducing a party to enter a lease); Bank of Naperville v. Holz, 407 N.E.2d 1102, 1106 (Ill. App. Ct. 1980).

This black letter rule is not changed by the fact that the integration clause in the Retro Treaty refers to "warranties" or "representations." See, e.g., Mother Earth, Ltd. v. Strawberry Camel, Ltd., 390 N.E.2d 393, 406 (Ill. App. Ct. 1979) (contractual provision disclaiming reliance on "any additional warranties" did not preclude introduction of extrinsic evidence of pre-contractual warranties and representations). As the Mother Earth court held, "it is well established that the terms of any written contract executed in conjunction with fraud are irrelevant to a cause of action grounded not in contract but in tort." Id.; see also Ginsburg v. Bartlett, Gen. No. 34,613, 1931 WL 3036, at *12 (Ill. App. Ct. May 19, 1931) ("The clause in the contract, stating that no representations have been made save as set forth in the writing, should be construed to have reference to the subject matter of the contract and not to representations fraudulently made to induce and bring about its execution").

PXRE does not seek to imply terms into, or alter or in any way modify the terms of, the Retro Treaty. Accordingly, Lumbermens' contention that the integration clause "precludes any effort [by PXRE] to import implied terms into the contract" (S.J. Br. at 15; emphasis added) is wholly misplaced and irrelevant to the disposition of its motion as respects PXRE's fraud claims.

### G. PXRE Has Proffered Evidence That Strongly Supports Its Claim For Negligent Misrepresentation

The evidence discussed above and outlined in the attached affidavits also supports PXRE's claim for negligent misrepresentation. At a minimum, there are questions of material fact regarding Lumbermens' misrepresentations, thus precluding any disposition of this claim on summary judgment.

As Lumbermens points out, to state a claim for negligent misrepresentation, Illinois law requires that the defendant must be in the business of supplying information for the guidance of

others. (S.J. Br. at 16). In support of its argument that PXRE cannot make such a showing, Lumbermens relies on Fox Associates v. Robert Half International, Inc., 777 N.E.2d 603, 608 (Ill. App. Ct. 2002). However, Fox Associates is materially distinguishable and actually supports PXRE's claim. Fox Associates confirms the legal rule that to determine whether a party is in the business of supplying information, "the precise facts of the specific case must be analyzed" and that determination is "dependent upon the nature of the information at issue and its relation to the kind of business being conducted." Id. The court held that "'[t]he critical question . . . is whether the information is an important part of the product offered. A business will be deemed to be in the business of supplying information if the information furnished along with the non-informational goods or services is central to the business transaction.'" Id. (citations omitted).

Applying this rule to the instant case, Lumbermens is deemed to be in the business of supplying information. The information regarding Equus Re's underwriting of the contracts in the Protected Portfolio was the central element of the Retro Treaty transaction. Without Lumbermens' representations, PXRE would not have entered into the transaction. (Rule 56.1 Statement ¶ 42). It cannot be disputed that Lumbermens provided information regarding Equus Re and the Protected Portfolio to guide PXRE's decision to enter into the Retro Treaty. (Id.)[11] Accordingly, PXRE has stated a claim for negligent misrepresentation.

---

[11] On the other hand, the facts in Fox Associates are wholly distinguishable. In that case, a client of an employment agency sued the agency for negligent misrepresentation after one of the agency's temporary employees embezzled money from the client. The client alleged that the agency had misrepresented that the employee had no criminal background, when in fact she had been convicted of theft. However, when the employee completed her application with the defendant agency, she had failed to report that conviction. In dismissing the negligent misrepresentation claim, the court held that (a) the purpose of the parties' relationship was simply for the agency to supply a skilled individual and that any information supplied was "merely ancillary" to that service; and (b) the agency was under no duty to initiate a criminal background check of its prospective employee before referring her to the client. 777 N.E.2d at 608. Here, by contrast, the information provided by Lumbermens to PXRE in connection with the Retro Treaty was (a) central to the transaction; and (b) completely within Lumbermens' own possession. Lumbermens did not depend upon a third party to accurately portray the information it was providing to PXRE – that information, upon which PXRE relied, came directly from Lumbermens' own experience in underwriting the contracts in the Protected Portfolio.

*          *          *

In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. <u>Anderson</u>, 477 U.S. at 255. In view of the evidence strongly supporting each element of PXRE's fraud and misrepresentation claims (Count II, III and IV), and the remedy of rescission, the presumption of truth given to this evidence pursuant to <u>Anderson</u>, and the fact that Lumbermens' waiver defense presents questions of highly disputed facts, summary judgment must be denied, as well as any relief limiting PXRE's fraud claims under Rule 16.

**II.     THE EVIDENCE PROFFERED BY PXRE IS MORE
          THAN SUFFICIENT TO JUSTIFY FURTHER
          DISCOVERY INCLUDING DEPOSITIONS BEFORE
          RULING ON LUMBERMENS' MOTION; ADDITIONAL
          <u>DISCOVERY IS "ESSENTIAL" PURSUANT TO RULE 56(f)</u>**

Summary judgment should not be entered "'until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion.'" <u>Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.</u>, 328 F.3d 309, 318 (7th Cir. 2003) (<u>citing</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986)); <u>see also</u> <u>Illinois State Empls. Union, Council 34, Am. Fed'n of State, Cty. & Mun. Empls., AFL-CIO v. Lewis</u>, 473 F.2d 561, 565 (7th Cir. 1972), <u>cert denied</u>, 410 U.S. 928, 943 (1973); <u>Albert Trostel & Sons Co. v. Canadian Imperial Bank of Commerce</u>, No. 82 C 7536, 1984 WL 868, at *3 (N.D. Ill. Aug. 21, 1984).

PXRE has not yet taken a single deposition, because it is only now that document discovery is nearing completion. Rule 56(f) of the Federal Rules of Civil Procedure expressly authorizes a dismissal or continuance of a summary judgment motion to allow for discovery in aid of opposition to the motion. As this Court has observed, Rule 56(f) "provides a safeguard against the improvident grant of summary judgment where the nonmovant demonstrates in good faith an inability to respond with the necessary factual material absent further discovery." <u>Polish Am. Cong. v. City of Chi.</u>, 226 F. Supp. 2d 930, 937 (N.D. Ill. 2002) (Shadur, J.); <u>see also</u> <u>Long Beach Mtg.</u>

Co. v. White, No. 95 C 4068, 1996 WL 135006, at *2 (N.D. Ill. Mar. 14, 1996) (Shadur, J.) (Rule 56(f) is intended to "prevent a responding litigant from being victimized by a prematurely-brought motion — one launched before the respondent has been enabled to marshal the facts needed to demonstrate a dispute in outcome-determinative facts").

The plaintiff need only establish a "fair likelihood that it can obtain material evidence through discovery" to obtain a dismissal or continuance under Rule 56(f). Concord Labs., Inc. v. Concord Med. Ctr., 552 F. Supp. 549, 554 (N.D. Ill. 1982) (emphasis added); see also C & F Packing Co. v. IBP, Inc., No. 93 C 1601, 1994 WL 36874, at *4 (N.D. Ill. Feb. 7, 1994).

If there is any question about whether the evidence PXRE has proffered is sufficient to defeat summary judgment, PXRE clearly meets the standards of Rule 56(f) entitling it to further discovery and a dismissal or continuance of the Summary Judgment Motion. PXRE's ability to depose the individuals listed below, as well as any others who played a material role in the solicitation, negotiation and placement of the Retro Treaty, is particularly critical where, as here, the Complaint alleges acts of fraud and concealment for which direct evidence will not likely be available. See, e.g., United States v. Britton, 289 F.3d 976, 981 (7th Cir. 2002). The Court in Hummel v. Riordon, 56 F. Supp. 983 (N.D. Ill. 1944), in refusing to grant summary judgment prior to the completion of discovery in a fraud case, explained:

> In cases involving charges of [fraud], the underlying facts and circumstances will not appear upon the face of the transaction as its very purpose invites and contemplates secrecy and concealment. Many facts are locked within the breast of the participants in the fraud and only the process of discovery afforded by the courts provide the means to demonstrate the fraudulent character of the transaction. The facts and circumstances are entirely within the knowledge of the participants and manifestly they would not reveal and disclose any fraudulent scheme in which they had participated. It is only by searching inquiry and a complete discovery that the character of the transaction may be revealed and the secrecy and darkness overhanging the transaction dispelled.

Id. at 986-87.

That logic applies equally to this case: We have no idea whether documents reflecting the inconsistencies between Lumbermens' representations and the truth about Equus Re's

underwriting were intentionally removed from the Equus Re files or otherwise concealed from PXRE. We do not know whether Lumbermens or Equus Re personnel considered whether to make affirmative disclosures and decided against it, or were told to remain silent. We would like to learn about Lumbermens' motives in creating the Equus Re Presentation when it knew that the information contained therein was false and misleading. We would like to know if there are additional side deals that are either undocumented or are in individuals' personal files. The evidence that bears on these and numerous other questions relating to the elements of PXRE's fraud claims rests primarily, if not entirely, with Lumbermens (and its agents). "To decide this motion without the fruits of such discovery would be manifestly unfair, especially since the evidence sought is solely in the control of the moving party." Albert Trostel & Sons, 1984 WL 868, at *3.

As described further in the Pierce Affidavit, given the proffer we have made with this Opposition Brief, there can be no doubt that PXRE is entitled to take the depositions of the following individuals:

1.      The individuals who submitted affidavits in support of Lumbermens' motion for summary judgment. These are Lydia Kam, the former President of Equus Re, Daniel Anelante, and Cary Stone. Clearly, PXRE is entitled to cross-examine these individuals regarding the matters about which they testified in their affidavits. (See Rule 56.1 Statement, Exh. R, Pierce Aff. ¶¶ 5-13 for a detailed description of the issues about which these individuals will be deposed, and how such testimony is essential pursuant to Rule 56(f)).

2.      The individuals and Rule 30(b)(6) witnesses responsible for making the written and verbal statements and misrepresentations to PXRE regarding Equus Re's underwriting approaches and methodologies. Having demonstrated that Lumbermens made specific, affirmative misrepresentations to PXRE, PXRE is entitled to depose the individuals and company representatives who made the misrepresentations (i.e., the persons who developed the Equus Re Presentation and the other solicitation materials discussed above, and who made the verbal

statements to the PXRE team) as well as individuals and Lumbermens company representatives with information relevant to knowledge, motive and intent (e.g., the individuals at Lumbermens responsible for the decision to engage in the solicitation and procurement of the Retro Treaty, and the Lumbermens personnel who provided information to Tillinghast for use in the Tillinghast Report, and who made the decision to provide the Tillinghast Report to PXRE to solicit PXRE's agreement to the Retro Treaty). (Rule 56.1 Statement, Exh. R, Pierce Aff. ¶ 5).

3. <u>Equus Re underwriters who engaged in side deals and loss-leader underwriting</u>. PXRE clearly is entitled to depose the Equus Re underwriters who entered into the "loss-leader" transactions described above, including Carol Correia, the underwriter responsible for the Lexington/Thor contract, to further establish PXRE's claim that it was defrauded, as well as to identify additional instances of side deals, loss-leader underwriting and possibly additional acts of underwriting malfeasance. (Rule 56.1 Statement, Exh. R, Pierce Aff. ¶¶ 9-10).

4. <u>Tillinghast and Pegasus</u>. PXRE is entitled to depose Tillinghast personnel relating to (a) what files were reviewed in preparing the Tillinghast Report; (ii) the basis for the conclusions in the Tillinghast Report; (b) Tillinghast's knowledge of the Lexington/Thor Side Deal and the other similar transactions described above; and (c) whether Tillinghast would have reached different conclusions if it had been aware of the Lexington/Thor Side Deal and the other instances of Lumbermens' underwriting malfeasance. PXRE is also clearly entitled to depose Pegasus, the intermediary responsible for soliciting PXRE and placing Lumbermens' retrocessional protection on the Protected Portfolio, since all communications between PXRE and Lumbermens before and after the February 2000 pre-binding audit were conducted through Pegasus. (Rule 56.1 Statement, Exh. R, Pierce Aff. ¶¶ 11-13).

## CONCLUSION

The evidence we have proffered establishes either (a) that PXRE clearly was defrauded and there can be no genuine dispute regarding this fact; or (b) a genuine dispute on certain questions relating to the fraud perpetrated by Lumbermens. In any event, when a summary judgment motion, like Lumbermens', relies on the moving party's version of the facts, supported by the movant's affidavits, and is filed before the parties have completed discovery, a dismissal without prejudice or a continuance of the motion pursuant to Rule 56(f) is appropriate. As the court stated in <u>Manning v. Dye</u>, No. 02 C 372, 2003 WL 145423 (N.D. Ill. Jan. 21, 2003), <u>aff'd sub nom.</u> <u>Manning v. Miller</u>, 355 F.3d 1028 (7th Cir. 2004), "if the defendants want to have the Court consider . . . their . . . defenses based on their own (and as yet unexamined) version of the events, simple fairness entitles [the plaintiff] to take discovery before requiring him to respond." <u>Id.</u> at *2; <u>accord</u> <u>Concord Labs.</u>, 552 F. Supp. at 554.

For the foregoing reasons, PXRE respectfully requests that the Court enter an Order either (a) dismissing Lumbermens' Summary Judgment Motion; or (b) granting a continuance of the Summary Judgment Motion and briefing until the close of discovery.

Dated:     July 28, 2004

_Randi Ellias_
One of the Attorneys for Plaintiff
PXRE REINSURANCE COMPANY

James I. Rubin (2413191)
Randi Ellias (6237021)
Teresa Snider (6210115)
BUTLER RUBIN SALTARELLI & BOYD
70 West Madison Street - Suite 1800
Chicago, Illinois 60602
(312) 444-9660

Kenneth R. Pierce (*pro hac vice*)
Jeffrey S. Burman (*pro hac vice*)
CADWALADER, WICKERSHAM & TAFT LLP
100 Maiden Lane
New York, NY 10038
(212) 504-6000

W:\P\PXRE\Pleadings\mem in opp of summ judgment.DOC