# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PXRE REINSURANCE COMPANY )
)
      Plaintiff, )   Case No. 03 C 5155
)
   vs. )   Judge Shadur
)
LUMBERMENS MUTUAL CASUALTY )   Magistrate Judge Bobrick
COMPANY )
)
      Defendant, )
)
———————————————— )
)
LUMBERMENS MUTUAL CASUALTY )
COMPANY )
)
     Third-Party Plaintiff, )
)
   vs. )
)
ALEA NORTH AMERICA COMPANY )
)
     Third-Party Defendant. )

**FILED**

JUL 2 2 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
AUG 1 1 2004

## PXRE'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT AND FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, following is a concise response to each statement of fact alleged in defendant Lumbermens' motion for summary judgment and further statement of material facts that require the denial of summary judgment, followed by a citation to the evidence in support thereof.

## PXRE'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT

1.    Plaintiff PXRE Reinsurance Company ("PXRE") is a Connecticut domiciled insurance company with its principal place of business in Edison, New Jersey. Complaint ¶ 4 (Tab A); Lumbermens' Answer, Counterclaims and Third Party Complaint ("Answer" or "Third Party Complaint") ¶ 4 (Tab B).



<u>Response to 1</u>

Admits Paragraph 1.

2.      Defendant Lumbermens Mutual Casualty Company ("Lumbermens") is an Illinois domiciled mutual insurance company with its principal place of business in Long Grove, Illinois. Complaint ¶ 5 (Tab A); Answer ¶ 5 (Tab B).

<u>Response to 2</u>

Admits Paragraph 2.

3.      Third-Party Defendant Alea North America Company ("Alea") is a Connecticut domiciled insurance and reinsurance underwriting manager and agent, with its principal place of business in Wilton, Connecticut. Alea North America Company was formerly named Rhine Re Finance Ltd. Third-Party Complaint ¶ 43 (Tab B); Alea's Answer to Third-Party Complaint ¶ 43 (Tab C).

<u>Response to 3</u>

Admits Paragraph 3.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the citizenship of the parties is diverse and the amount in controversy is in excess of $75,000, exclusive of costs and interest. Complaint ¶ 6 (Tab A); Answer ¶ 6 (Tab B).

<u>Response to 4</u>

Admits Paragraph 4.

5.      This Court has subject matter jurisdiction over the third-party action because (a) the claims asserted are ancillary to the claim of PXRE against Lumbermens, (b) the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), and (c) the citizenship of the parties is diverse and the amount in controversy is in excess of $75,000, exclusive of costs and interest, so that jurisdiction is granted by 28 U.S.C. § 1332(a)(1). Third-Party Complaint ¶ 44 (Tab B); Answer to Third-Party Complaint ¶ 44 (Tab C).

<u>Response to 5</u>

Lacks knowledge or information sufficient to form a belief to admit or deny.

6.      Venue is proper in this Court with respect to the Complaint under 28 U.S.C. § 1391(a) because the Defendant resides in this District. Complaint ¶ 7 (Tab A); Answer ¶ 7 (Tab B.

<u>Response to 6</u>

Admits Paragraph 6.

7.     Venue is proper in this Court with respect to the Third-Party Complaint under 28 U.S.C. § 1391(a) and (c) because the Third-Party Defendant is a corporation subject to personal jurisdiction in this district and because the Third-Party Defendant consented to venue in this Court in the Underwriting Management Agreement entered into as of December 3, 1999. Third-Party Complaint ¶ 45 (Tab B); Answer to Third-Party Complaint ¶ 45 (Tab C).

<u>Response to 7</u>

Lacks knowledge or information sufficient to form a belief to admit or deny.

8.     This case concerns an "Aggregate Excess of Loss Retrocessional Reinsurance Agreement" between Lumbermens and PXRE. This agreement is referred to herein and in Lumbermens' accompanying Memorandum of Law as the "Retro Contract." A copy of the Retro Contract, which was attached as Exhibit 1 to the Complaint is annexed to this statement at Tab D.

<u>Response to 8</u>

Admits Paragraph 8 to the extent that this case involves the solicitation, negotiation and placement, as well as the performance, of the Aggregate Excess of Loss Retrocessional Reinsurance Agreement, and further rejects Lumbermens' characterization of the Aggregate Excess of Loss Retrocessional Reinsurance Agreement between Lumbermens and PXRE as the "Retro Contract."

9.     In 1998 and 1999, Lumbermens had an operating division called Equus Re, which wrote assumed reinsurance business on Lumbermens paper. That is, Equus Re personnel, then employees of Lumbermens, bound Lumbermens to reinsurance contracts in which some third party was the ceding company and Lumbermens was the reinsurer. Complaint ¶ 12 (Tab A); Answer ¶ 12 (Tab B).

<u>Response to 9</u>

Admits Paragraph 9.

10.     During 1999, Lumbermens sought to divest itself of its Equus Re division, including the business Equus Re had already written. Third-party defendant Alea North America Company ("Alea") agreed to buy the operation. The sale of Equus Re to Alea closed on December 3, 1999. Complaint ¶¶ 18-19 (Tab A); Answer ¶¶ 18-19 (Tab B).

<u>Response to 10</u>

Denies Paragraph 13 and refers the Court to the terms and conditions of the
Underwriting Management Agreement between Lumbermens and Alea, which is attached to the
Complaint as Exhibit 1C.

14. At the time of the sale of the Equus Re division in December 1999, Lumbermens' business records, including the underwriting and claims files, relating to the Protected Portfolio were transferred to Alea. Third-Party Complaint ¶ 51 (Tab B); Third-Party Answer ¶ 51 (Tab C). This fact is only material to the pending motion insofar as it concerns the Thor Contract, discussed below.

Response to 14

Lacks knowledge or information sufficient to form a belief to admit or deny.

15. Following the sale of Equus Re, Lumbermens engaged Pegasus Advisors, Inc., a reinsurance intermediary to obtain retrocessional protection to reduce its risk on the Stop Loss Cover. Complaint ¶ 33 (Tab A). The engagement of Pegasus is set forth herein as helpful background, not as a material fact.

Response to 15

Admits the first sentence of Paragraph 15, and denies the second sentence.

16. On December 17, 1999, Pegasus sent a solicitation letter and background information to PXRE. (Tab H; *see also* Complaint ¶ 35 (Tab A)).

Response to 16

Admits that on December 17, 1999, Pegasus sent a solicitation letter and materials
to PXRE, except further states that the information sent by Pegasus to PXRE with the December
17, 1999 solicitation letter contained material statements and representations by Equus Re upon
which PXRE reasonably relied in agreeing to the Retro Treaty transaction. (Mayer Aff. (Ex. O)
¶ 11,25.)

17. The information sent by Pegasus to PXRE included a June 30, 1999 Reserve Review of the Protected Portfolio, which included a list of the specialty casualty contracts in the Protected Portfolio that specifically identified the Thor Contract (contract number 180232-0). (Tab I)

<u>Response to 17</u>

Admits that the Thor contract appears on a list which is part of a June 30, 1999

Reserve Review of the Protected Portfolio.

18.   PXRE expressed interest in proceeding and conducted a due diligence review of the
      Protected Portfolio at the offices of Alea between February 10 and 15, 2000.  Complaint
      ¶ 37 (Tab A); Answer (Tab B); Third Party Answer ¶ 53 (Tab C).  A copy of PXRE's
      report of that review, which was produced by PXRE in this litigation, is annexed to this
      statement at Tab J.

<u>Response to 18</u>

Admits Paragraph 18.

19.   Prior to the on-site visit, PXRE requested and received from Alea a bordereau listing the
      clients, limits, and premiums of the contracts in the Protected Portfolio so that PXRE
      could choose the files to review while on site.  Affidavit of Cary R. Stone, Ex. 1 (annexed
      at Tab K).

<u>Response to 19</u>

Denies Paragraph 19 and refers the Court to the February 8, 2000 e-mail from

Daniel Anelante of Alea to Larry Frank of Pegasus, a copy of which is attached to Exhibit K to

Lumbermens' Rule 56.1 Statement.

20.   The PXRE employees who participated in the due diligence of the Protected Portfolio
      included Steve Bodnar, Joe Crespo, Jim Nisch, Chris Wachter, and Bob Yenke.  (*See* Tab
      J).

<u>Response to 20</u>

Admits Paragraph 20, except further states that Jeffrey Mayer also participated in

the pre-binding contract review of the Protected Portfolio.  (Ex. O, Mayer Aff. ¶ 17.)

21.   Every file that PXRE asked to review was in fact made available by Alea.  All of Alea's
      files were available on site for review by PXRE.  Affidavit of Lydia Kam ¶¶ 7-9
      (annexed at Tab L).

<u>Response to 21</u>

Lacks knowledge or information sufficient to form a belief to admit or deny

Paragraph 21.

22.     On February 22, 2000, following its due diligence of the Protected Portfolio at Alea's offices, PXRE offered to reinsure Lumbermens for the first 25 loss ratio points in excess of the 75% attachment point of the Stop Loss, cover, subject to an overall cap of $50,000,000. The premium PXRE requested for taking the risk was 10.375% of underlying subject premium. In round numbers, and based on $200 million of underlying subject premium, PXRE was agreeing to take $50 million of risk for $20.75 million of premium. A copy of PXRE's February 22, 2000 offer, which was produced by PXRE in this litigation, is annexed at Tab M.

Response to 22

        Admits that Paragraph 22 is, in general terms, an accurate description of PXRE's

offer to reinsure Lumbermens in connection with the Retro Treaty transaction.

23.     On April 10, 2000, Lumbermens entered into the Retro Contract with PXRE. (Tab B).

Response to 23

        Admits that on April 10, 2000, PXRE executed the Aggregate Excess of Loss

Retrocessional Reinsurance Agreement.

24.     At the time the Retro Contract incepted, underlying subject premium was estimated to be $193 million. Accordingly, Lumbermens paid premium to PXRE of $20,023,750. (Tab N).

Response to 24

        Admits that at or around the time of the inception of the Aggregate Excess of

Loss Retrocessional Reinsurance Agreement between Lumbermens and PXRE incepted, PXRE

received premium of $20,023,750.

25.     Over time, due to fluctuations in the level of estimated subject premium, Lumbermens made several adjustments to the premium paid to PXRE.

        •       As of December 31, 2000, estimated subject premium had dropped, so PXRE returned to Lumbermens premium associated with the difference, together with interest, in a total amount of $1.16 million. (Tab N).

        •       As of June 30, 2001, estimated premium had increased, so PXRE accepted from Lumbermens additional premium, together with interest, in a total amount of $1.07 million. A portion of this amount was paid as late as March 2002, due to subsequent adjustments in the calculation. (Tab O).

- As of December 31, 2001, estimated premium exceeded $200 million and PXRE accepted another premium payment from Lumbermens, together with interest, in a total amount of just under $1 million. (Tab P).

## Response to 25

Admits that over time, due to fluctuations in the level of estimated subject premium, adjustments were made to the amount of premium received by PXRE.

26. At no time prior to filing the Complaint in this litigation did PXRE tender this premium back to Lumbermens.

## Response to 26

Admits Paragraph 26, except further states that at or around the time the Complaint was filed, PXRE initiated the creation of a trust to deposit the premium, subsequent to which Lumbermens itself proposed that PXRE set aside the premium into a segregated account to fund claim payments during the pendency of this litigation, which has since been effectuated by agreement of the parties.

27. The only alleged "side agreement" in this case is the alleged Lexington Agreement, which relates to a 1998 contract known as the "Thor Contract" in which Lumbermens (by its Equus Re division) agreed to reinsure Lexington Insurance Company, an unaffiliated third party, with respect to certain professional liability insurance Lexington had written. PXRE Rule 30(b)(6) Deposition ("PXRE Dep.") at 64:21-65:15 (Tab Q).

## Response to 27

Denies Paragraph 27 (Ex. O, Mayer Aff. ¶ 58-64.)

28. PXRE claimed during its Rule 30(b)(6) deposition in this case that it first learned of this alleged "side agreement" when it reviewed the underwriting file for the Thor Contract in June 2003. PXRE Dep. at 15:21-16:18, 20:24-21:8, 29:5-13, 35:7-12, 36:13-18, 72:4-22 (Tab Q).

## Response to 28

Admits that PXRE first learned of the Thor Side Agreement during a file review at Alea in June 2003.

29. The principal document reflecting the alleged "side agreement" is a memo from Equus to Lexington dated December 21, 1998, which appears in the Thor underwriting file in the correspondence section. Affidavit of Daniel Anelante at ¶ 4 (annexed at Tab R).

Response to 29

Denies the characterization of the December 21, 1998 memo from Equus Re to Lexington as the "principal document" reflecting the Thor Side Agreement, lacks knowledge or information sufficient to form a belief to admit or deny that the December 21, 1998 memo appears in the Thor underwriting file, and further states that there are numerous documents, in addition to the December 21, 1998 memo, that are relevant to Equus Re's and Lexington's agreement to enter into the Thor Side Agreement. (See Ex. F)

30. On July 17 and 18, 2000, PXRE conducted an audit of the Protected Portfolio at Alea's offices jointly with personnel from Lumbermens. Attending from PXRE were Chris Wachter, Jeffrey Mayer, and Jim Nisch. Affidavit of Cary R. Stone ¶ 3 (Tab K).

Response to 30

Admits Paragraph 30, except further states that this review, in contrast to the Pre-Binding Audit, was focused on claims handling and claims files, as opposed to underwriting. (Mayer Aff. ¶ 78.)

31. On August 7, 2000, Cary Stone of Lumbermens e-mailed a report of the joint review to Chris Wachter, a PXRE actuary, and Jeffrey Mayer, PXRE's underwriter on the Retro Contract. The four-page report included a half-page discussion of the Thor Contract and the Lexington Agreement titled "Lexington/Thor." The discussion began as follows:

> This is a Professional Indemnity Q/S which was refused by the Equus London underwriters, then presented to [its Connecticut office in] Norwalk which also declined. Eventually, in exchange for promises to use Equus on two other programs (which also turned out to be bad, but not as bad), Equus agreed to write a 25% share.

PXRE has admitted that it actually received the August 2000 report by producing a copy of that report from its own files. (Tab S).

Response to 31

Admits that Paragraph 31 contains an excerpt from an August 7, 2000 e-mail from Cary Stone to Jeffrey Mayer and Christopher Wachter, and further states that the contents of the e-mail must be read as a whole. (Mayer Aff. ¶ 79-88; Ex. L.)

32. PXRE conceded, through its Fed. R. Civ. P. 30(b)(6) witness, that the August 2000 report it received from Lumbermens describes a "side agreement" as PXRE defines that term. PXRE Dep. at 30:14-31:4; 32:7-32:21 (Tab Q); PXRE First Set of Document Requests, Request No. 19 (Tab T).

Response to 32

Denies Paragraph 32. (Mayer Aff. ¶ 79-88.)

33. In October 2000, Ms. Stone sent Messrs. Wachter and Mayer an Alea report concerning the Thor Contract with a cover e-mail that stated:

> You may remember that Equus/Alea had some concerns about the (lousy) results on this pro rata contract, and had asked a bunch of questions before paying. Attached is a further update on the status. It appears they are paying under a reservation of rights, but are scheduling an underwriting and claim audit in London the week for 15-19 January next year. By the time of our visit in February there should be enough information for us to see what's what.

Affidavit of Cary R. Stone, Ex. 2 (Tab K).

Response to 33

Admits Paragraph 33.

34. In January 2001, Ms. Stone sent PXRE another e-mail including a list of the issues she felt should be addressed during the upcoming visit to Alea, specifically suggesting that they obtain an update on the Thor Contract "that has had such poor results." PXRE produced a copy of this e-mail from its files in this litigation. (Tab U).

Response to 34

Admits that in January 2001, Ms. Stone apparently sent an e-mail to Jeffrey Mayer and Christopher Wachter, containing the quoted language above, and further states that the e-mail, attached as Exhibit U to Lumbermens' Rule 56.1 Statement, must be read as a whole. (Ex. O, Mayer Aff. ¶ 79-88; Ex. N.)

35.     In July 2001, Ms. Stone sent Mr. Wachter a claims review report by Alea concerning the Thor Contract, noting in her cover letter that "this contract was singled out by [Alea actuary] Liz Sander, and is reserved to come in at a 500% [loss ratio]. (Incurred was $3,213,720 as of 3/31/01)." PXRE produced a copy of this report from its files in this litigation. (Tab V).

Response to 35

        Admits that Ms. Stone sent a June 2001 report relating to Lexington/Thor, lacks

knowledge sufficient to form a belief to admit or deny whether it was sent in July 2001, and

further states that the report, attached as Exhibit V to Lumbermens' Rule 56.1 Statement, must

be read as a whole.

36.     PXRE participated in further joint review of the Protected Portfolio on February 28 and March 1, 2002 and February 26 to 28, 2003. Affidavit of Cary R. Stone, ¶¶ 6-7. (Tab K).

Response to 36

        Admits Paragraph 36, except further states that the reviews to which Paragraph 36

refers were primarily claims file reviews, as contrasted with the February 2000 review, at which

the PXRE pre-contract review team reviewed underwriting files. (Ex. O, Mayer Aff. ¶ 76-78.)

37.     On March 28, 2003, PXRE's Chief Financial Officer, John Modin, wrote to Cary Stone requesting another visit to access to the books and records of the reinsured business kept at Alea.  Modin invoked Section X.B of the Retro Contract requesting access to "all books, records, and documents of [Alea] reasonably relating to the Business Reinsured." In making this request, PXRE affirmed its "understanding that most of the information necessary to achieve our objectives is located at [Alea] so this is where we will most likely begin our procedures." PXRE produced a copy of its request in this litigation. (Tab W).

Response to 37

        Admits that Mr. Modin requested an inspection of records as set forth in his

March 24, 2003 letter to Kemper Insurance Companies, a copy of which is attached as Exhibit W

to Lumbermens' Rule 56.1 Statement, denies that Mr. Modin's request constituted an affirmation

or understanding of the location of materials relevant to such an inspection, and refers the Court

to Mr. Modin's March 28, 2003 letter, attached as Exhibit W to Lumbermens' Rule 56.1

Statement.

38.   Once again, on June 9 to 15, 2003, PXRE was given access to the books and records on the Protected Portfolio. It is during this last audit that PXRE claimed, at its Rule 30(b)(6) deposition in this case, that it first learned of the alleged Lexington Agreement. PXRE Dep. at 72:4-22. (Tab Q).

Response to 38

Admits that PXRE conducted a review of the Protected Portfolio in June 2003,

during which time it first learned of the Lexington/Thor Side Deal.

39.   PXRE expressly invoked Section X.B of the Retro Contract yet again *after* it filed the Complaint in this action in an e-mail from its counsel. (Tab X).

Response to 39

Denies PXRE "invoked" Section X.B of the Retro Treaty and refers the Court to

the e-mail attached as Exhibit X to Lumbermens' Rule 56.1 Statement.

## PXRE'S STATEMENT OF FACTS SUPPORTING DENIAL OF SUMMARY JUDGMENT

40.   By letter dated December 17, 1999 (the "Solicitation Letter"), Lumbermens,

through its broker and agent, Pegasus Advisors, solicited PXRE's interest in the Retro Treaty

transaction. (Ex. O, Mayer Aff. ¶ 9.)

41.   The Solicitation Letter discussed, among other things, an analysis performed by

the actuarial firm Tillinghast, which was retained by Lumbermens to evaluate the expected

performance of the Protected Portfolio. The report prepared by Tillinghast (the "Tillinghast

Report"), a copy of which was provided to PXRE in conjunction with the Solicitation Letter,

concluded that the Protected Portfolio would have a 75% loss ratio. (Ex. O, Mayer Aff. ¶ 10, Ex.

C.)

42.     The Solicitation Letter also attached an informational package (the "Equus Re Presentation") describing Equus Re's history, the biographies of key personnel, the underwriting approach used by Equus Re, and other representations that were material to and relied upon by PXRE in its analysis of, and decision to agree to the Retro Treaty transaction. (Ex. O, Mayer Aff ¶ 11; Ex. B.)

43.     Members of the PXRE pre-contract review team personally interviewed Lydia Kam during their visit in February 2000.   During the interview, Ms. Kam made specific statements and representations which reinforced the written statements contained in the Solicitation Letter, Equus Re Presentation and Tillinghast Letter (the "Soliciation Package") about Equus Re's underwriting approach and methodology. (Ex. O, Mayer Aff. ¶ 18.)

44.     PXRE relied upon the statements and representations provided in the Solicitation Package, and as reinforced by the former Equus Re personnel, in agreeing to the Retro Treaty transaction.   Those statements and representations were false and misleading at the time they were made.   Jeffrey Mayer, the PXRE official heading the pre-contract interviews and document review, would not have recommended to PXRE senior management and the PXRE underwriting committee that PXRE enter into the transaction if he had known that these statements and representations were false or were misleading.  (Ex. O, Mayer Aff. ¶ 19.)

45.     The representations in the Solicitation Materials and made verbally by Lumbermens and its agents indicated to PXRE that Equus Re underwrote each contract in the Protected Portfolio on its merits.  PXRE, in turn, was able to construct its pricing model based on this fundamental and critical representation. (Ex. O, Mayer Aff. ¶ 20.)

46.     The purpose of PXRE's on-site visit at Alea in February 2000 was to:  (a) meet and interview senior Alea (former Equus Re) personnel to discuss and learn more about Equus Re's approach and methodology in connection with reinsurance underwriting; (b) to review a

sampling of the underwriting and claim files in the Protected Portfolio to confirm PXRE's initial pricing; and (c) validate PXRE's understanding of the composition (by line of business) of the Protected Portfolio. (Ex. O, Mayer Aff. ¶ 22, 24.)

47.     The February 2000 visit (hereafter referred to as the "Pre-Binding Audit") was not intended to be, nor was it understood by either PXRE or Lumbermens to be an examination by PXRE of each and every document in each and every underwriting and claim file. Instead, the approach taken by PXRE – consistent with the normal and customary approach in the reinsurance industry for transactions of this type – was to review a sampling of files and documents, while relying on verbal statements made by the Equus Re personnel, in evaluating the transaction. This was also the approach adopted by Tillinghast in developing its conclusion that the Protected Portfolio would have a 75% loss ratio. (Ex. O, Mayer Aff. ¶ 23.)

48.     PXRE adopted this approach to the Pre-Binding Audit for several reasons:  (a) Lumbermens did not afford PXRE the time or the opportunity to review each document in each file.  There were approximately 350 different reinsurance treaties in the Protected Portfolio.  The underwriting and claim files for these treaties were extremely voluminous, amounting to over 200,000 pages.  Prior to going to Alea, PXRE was told by Mr. Frank that it would have three or four days to complete our interviews and document review.  It obviously would have been physically impossible for PXRE's team to examine each document in each file over that period of time; (b) the time PXRE was given to review this volume of documents was consistent with the point made above that merely reviewing a sampling, as the normal and customary approach, was the approach both sides expected here; (c) even if Lumbermens had afforded PXRE more time, it would have been economically infeasible for PXRE – or any reinsurer -- to devote the time, expense and resources that would have been involved in an examination of each and every document in the Protected Portfolio files.  Reinsurers are not expected or required to duplicate

(Ex. B), and the Tillinghast Report (Ex. C). The verbal statements were made by Lumbermens' broker and agent, Lawrence Frank, as well as former Equus Re personnel including Lydia Kam, Elizabeth Sander and Daniel Anelante. These written materials and verbal statements concerned Equus Re's underwriting of the contracts included within the Protected Portfolio. They were material to PXRE and PXRE relied upon them, as well as its review of a sampling of the Protected Portfolio documents, in binding the Retro Treaty. (Ex. O, Mayer Aff. ¶ 25.)

50. The Equus Re Presentation (Ex. B) made the following statements about Equus Re, and, in particular, its underwriting approaches and methodologies, which were material to PXRE's decision to enter into the Retro Treaty:

> (a) Equus Re performed "disciplined, controlled underwriting" (Ex. B at LMCC 02179);
>
> (b) Equus Re's "Strategic and Operational Tenets" included (i) "Underwriting Focus and Integrity"; (ii) "Controls"; (iii) "Multidisciplined Teams"; (iv) a "Lead Mentality & Behavior"; (v) "Selectivity – Cherry Picking" (Ex. B at LMCC 02182);
>
> (c) The "Portfolio Focus" was on "Profitability." (Ex. B at LMCC 02183)

51. In describing its underwriting approach to one type of business, casualty business, the Equus Re Presentation (Ex. B at LMCC 02198) states that Equus Re's focus was directed to:

> (a) "Underwriting integrity";
>
> (b) "[Return on equity] objectives";
>
> (c) reinsuring cedents that had, among other things, "Underwriting technical expertise";

52. Similarly, the Equus Re Presentation represented that Equus Re's Integrated Programs were "Underwritten by an experienced Line of Business or Class Underwriting Specialist" (Ex. B at LMCC 02200) and that its Alternative Risk Division maintained a

"Disciplined underwriting approach" and focused on "High quality, preferred risks" (Ex. B at LMCC 02201.)

53.     In the Equus Re Presentation, there was a chart in which Equus Re held itself out as an "Integrated Business Unit" combining expertise from all areas of reinsurance, including actuarial, audit and underwriting review (Ex. O, Mayer Aff. ¶ 29, Ex. B at LMCC 02205). The representation that Equus Re utilized actuaries and auditors as part of a multi-disciplined underwriting team further confirmed to me that Equus Re was underwriting each risk on its individual terms to determine with the most precision possible whether the risk would be profitable on its own merits. There were also biographies of Equus Re's officers indicating that Equus Re had the actuarial, auditing and underwriting skills that it purported to have in the rest of the presentation (Ex. O, Mayer Aff. ¶ 29.)

54.     The statements in the Equus Re Presentation described above indicated to PXRE that the reinsurance transactions in the Protected Portfolio were underwritten based upon the specific merits of each respective transaction. PXRE was led to believe based on the Equus Re Presentation (reinforced by the verbal statements of Lydia Kam) that Equus Re (a) carefully selected ("cherry picked") the lines of business and types of reinsurance contracts that it would consider writing, based on the potential for those lines or contracts to generate a profit; and (b) would reinsure a risk only if a disciplined underwriting review, including the participation of actuaries and other members of the "team" concluded that the particular risk, on its own merits, would generate a profit. (Ex. O, Mayer Aff. ¶ 30.)

55.     In particular, the statements in the Equus Re Presentation indicated to PXRE that Equus Re was not a reinsurer that did, or would, accept known loss-generating business or other business that did not meet its underwriting standards because of ulterior motives or purposes such as (a) side deals guaranteeing profits on future, unrelated business (that would not be

-17-

included in the Protected Portfolio); or (b) in order to ingratiate itself with ceding insurers or brokers. To the contrary, PXRE was led to believe, through these (and other representations described below), that Equus Re applied meticulously its extensive actuarial and underwriting expertise to evaluate each submitted risk on its own merits. (Ex. O, Mayer Aff. ¶ 31.)

56. In addition to the Equus Re Presentation, Lumbermens' agent Pegasus provided PXRE with an independent actuarial analysis of the Protected Portfolio undertaken by Tillinghast, a large and highly regarded actuarial consulting firm. (Ex. O, Mayer Aff. ¶ 32.)

57. The Tillinghast Report was furnished to PXRE as an integral part of Lumbermens' solicitation efforts. The Solicitation Letter refers extensively to the Tillinghast Report, and its findings are characterized by Pegasus as "important positive points to consider" in evaluating the Retro Treaty. (Ex. A; Ex. O, Mayer Aff. ¶ 33.) Lumbermens' agent Mr. Frank stated to Jeffrey Mayer in a telephone conversation in or around December 1999 that the Tillinghast Report gave him "comfort" that Equus Re in fact had abided by the principles and approaches outlined in the Equus Re Presentation. (Ex. O, Mayer Aff. ¶ 33.)

58. In its report, Tillinghast analyzed the loss and loss adjustment expense liabilities associated with, and the potential profitability and cash flows of, the Protected Portfolio as of June 30, 1999. (Mayer Aff. ¶ 34.)

59. The Tillinghast Report stated that its findings were based on a review of a sample of contracts in the Protected Portfolio. According to the report, the sample selected by Tillinghast covered "a broad range of the types of business underwritten to date by Equus" and, in Tillinghast's opinion, "provide[d] a reasonable estimate of the profitability" of the Protected Portfolio. (Ex. C at PXRE 004322-24.)

60. The Tillinghast Report concluded, among other things, that:

(a) the total expected loss ratio estimate for the contracts reviewed was 73.9%;

(b) the overall expected loss ratio estimate for the Protected Portfolio was 75.0%;

(c) the range of expected loss ratio estimates was 64.4% to 83.4%;

(d) 14% of the losses were expected to be paid by the end of 2000, 81% by the end of 2005 and 96% by the end of 2010;

(e) Equus Re's underwriting process was "very team-oriented, with multiple underwriters and actuarial input on most accounts" and that "the pricing assumptions were generally very well documented."

(Id.)

61.     PXRE regarded the Tillinghast Report to be a very significant document in connection with our evaluation of the proposed transaction. PXRE knew that the Tillinghast Report would be an independent evaluation of the Protected Portfolio by actuarial experts, and was not an advocacy piece or sales puffery. (Ex. O, Mayer Aff. ¶ 37.)

62.     The fact that an independent firm of Tillinghast's stature and reputation concluded that the loss ratio would be 75% and that Equus Re's underwriting process was team-oriented, with actuarial input, gave PXRE comfort that Equus Re's representations in the Equus Re Presentation were accurate. (Ex. O, Mayer Aff. ¶ 38.)

63.     Tillinghast did not review the file containing the Lexington/Thor Side Agreement. (Ex. C at PXRE 004333). PXRE does not know whether Tillinghast nevertheless was made aware of these documents, nor does it know whether Tillinghast would have reached a different conclusion regarding the loss ratio and Equus Re's underwriting approach if it were aware of those documents. (Ex. O, Mayer Aff. ¶ 39.)

64.     In or around early December 1999 Mr. Frank of Pegasus informed PXRE that the Retro Treaty transaction would be presented to PXRE. (Ex. O, Mayer Aff. ¶ 40.)

65.     In one telephone conversation that Jeffrey Mayer had with Larry Frank in or around December 1999, Mr. Frank told Mr. Mayer that he "drew comfort" from the Tillinghast Report that Equus Re in fact had abided by the underwriting principles and approaches outlined in the Equus Re Presentation and described above. (Ex. O, Mayer Aff. ¶ 41.)

66.     One of the first meetings held during the February 2000 visit was with Lydia Kam.   In the Equus Re Presentation, Ms. Kam was identified as the President and Chief Operating Officer of Equus Re. (Ex. B at LMCC 02207.) PXRE's meeting with Ms. Kam lasted approximately one hour, and during the meeting PXRE asked Ms. Kam a series of questions about Equus Re's underwriting approaches and methodologies. (Ex. O, Mayer Aff. ¶ 42.)

67.     Ms. Kam was asked why she and other Equus Re personnel left their former employer, TIG Re.  Ms. Kam responded with words to the effect that at Lumbermens, she and the team would have a better environment in which to underwrite reinsurance risks based on disciplined underwriting, rather than operate under the pressure of building premium volume by accepting risks that did not meet rigorous underwriting standards. (Ex. O, Mayer Aff. ¶ 43.)

68.     During the interview, Ms. Kam emphasized the "experience" and "excellence" of the Equus Re underwriting team.  Ms. Kam specifically stated that Equus Re's underwriting approach was "team oriented," and utilized a "full pricing" methodology.  PXRE understood Ms. Kam's use of these terms to mean that Equus Re employed disciplined underwriting, priced risks on their own merits, and did not enter into transactions that would generate known or expected losses in return for side deals or side promises of future profitable business. (Ex. O, Mayer Aff. ¶ 44.)

69.     At no time during or after the interview did Ms. Kam ever state or suggest to PXRE, or refer PXRE to documents that would have indicated that, Equus Re had in fact adopted

an underwriting approach and business practice that was inconsistent with the Equus Re Presentation, the Tillinghast Report and her own statements. (Ex. O, Mayer Aff. ¶ 45.)

70. Neither Ms. Kam nor any other of Equus Re's personnel or agents ever even hinted that Equus Re compromised its underwriting of the Protected Portfolio for purposes of securing profits for itself on future business that would in no way inure to PXRE's benefit. (Ex. O, Mayer Aff. ¶ 46; Ex. P, Yenke Aff. ¶ 20.)

71. During the February 2000 Pre-Binding Audit, certain members of the PXRE team spoke with other Equus Re officials including Elizabeth Sander (the Equus Re Vice President and Pricing Manager) and Daniel Anelante (the Equus Re Senior Vice President and Director of Underwriting Operations). Ms. Sander and Mr. Anelante had made statements to them regarding Equus Re's underwriting approach and methodology that were consistent with the written and verbal statements discussed above. (Ex. P, Yenke Aff. ¶ 20.)

72. Ms. Sander stated that Equus Re did not reinsure any contract in the Protected Portfolio for which it had not anticipated at least a 7% return on surplus allocated to that particular contract. (Ex. P, Yenke Aff. ¶ 19.)

73. The Solicitation Letter, the Equus Re Presentation, the Tillinghast Report, and the verbal statements made by Mr. Frank, Ms. Kam, Ms. Sander and Mr. Anelante described above, separately and taken together, constituted representations to PXRE that Equus Re:

> (a) carefully selected ("cherry picked") the lines of business and types of reinsurance contracts that it would consider writing, based on the potential for those lines or contracts to generate a profit;

> (b) reinsured risks after concluding, based on a disciplined underwriting review (undertaken by actuaries and other members of an "integrated team") that the particular risk, on its own merits, would generate a profit; and

> (c) that this approach and methodology constituted the "Strategic and Operational Tenets" of Equus Re (Ex. B at LMCC 02182; emphasis added).

(Ex. O, Mayer Aff. ¶ 48.)

74.     There was nothing unclear or vague about those statements and representations to PXRE. (Ex. O, Mayer Aff. ¶ 49.)

75.     Those representations were false and misleading when they were made. As reflected in the documents attached as Exs. F-K, Equus Re had adopted an approach to underwriting that was utterly inconsistent with the above mentioned representations. Equus Re consistently and intentionally compromised its stated underwriting standards, apparently for the purpose of ingratiating itself or building relationships with brokers or ceding insurers in the hope of a future payoff. (Mayer Aff. ¶ 50.)

76.     Equus Re even documented the side deal or side arrangement it had made with the broker or ceding company in which Equus Re would either be provided, or could expect, profitable business in the future. As one Equus Re official noted in connection with of these instances, the approach Equus Re had adopted was "not the norm" for the industry. (Ex. G.)

77.     The Lexington/Thor (Ex. F) file indicates that, in or around August 1998, Equus Re was solicited to reinsure a book of professional indemnity business of Lexington Insurance Company ("Lexington"), an affiliate company of American Insurance Group ("AIG") that was produced by Thor Underwriting Limited, a managing general agent located in the U.K. Apparently due to the fact that Equus Re was not appropriately staffed at the time to write U.K. business, it declined consideration of the account. (Ex. F at ALEA 00065181.)

78.     Following Lexington's request that Equus Re reconsider its declination, Equus Re's actuary analyzed the account and concluded that it would produce significant losses. After Equus Re communicated the results of its actuarial review to Lexington in October 1998 (Ex. F at ALEA 00065144), the parties apparently began exploring other ways to get a deal done.

79. By early November 1998, the parties had discussed a proposal in which Equus Re would agree to reinsure this money-losing account in exchange for a "side letter guarantee" from Lexington promising to "make whole" Equus Re for the significant losses it expected to incur if it reinsured this account. A November 16, 1998 letter from Carol Correia at Equus Re to Kevin Kelly of Lexington indicates that the loss potential on the Lexington/Thor account was deemed by Equus Re to be so definite and significant as to require a side agreement guaranteeing a profit on future business, and future profit potential only was unacceptable. Indeed, Lexington's Andrew Archambault, in his fax dated November 17, 1998 to Carol Correia, even set forth a proposed "payback" which would "offset an anticipated loss" on the Thor program. (Ex. F at ALEA 00065128.)

80. In December 1998, the parties reached an agreement. Equus Re agreed to provide a 25% quota share of Lexington's net retention of the Thor business, in exchange for a "side agreement" from Lexington to cede to Equus Re, to be accepted at Equus Re's discretion, all of Lexington's property and casualty business until Equus Re achieved a 10% profit margin, at which time the "side agreement" would be automatically commuted, thus locking in the 10% profit to Equus Re. (Ex. F at ALEA 00064989-90.)

81. Although the side deal with Lexington was not struck until December 1998, the parties agreed that the reinsurance transaction would be back-dated to July 1, 1998. (Id.)

82. These documents reveal that Equus Re accepted the Thor account knowing that it would perform poorly and generate significant losses – blatantly and obviously inconsistent with the aforementioned representations about Equus Re's underwriting methodology. More egregiously, however, Equus Re knew that Lexington expected to incur a loss, but wished to use the device of a back-dated reinsurance agreement to mitigate the impact of this known loss.

Lexington's guarantee of a 10% future profit appears to have had the effect of transferring into the future losses which had been incurred by Lexington between July and December 1998.

83.    The Wellington Syndicate 2020 (Ex. G) account provides another glaring example of Equus Re's undisclosed practice of positioning itself for future business opportunities ahead of underwriting integrity, in clear contravention of its statements and representations to PXRE. Equus Re's underwriting notes reveal that it had already declined this account at least once, but had been asked again to write it by the broker who "needs a favour" and "are stuck" because "they have used all their favours placing the programme." When it was re-approached to reinsure this account, Equus Re knew that: (a) the account was "well underrated considering the [Hurricane] Marilyn and George Loss which has grown dramatically since this account was quoted"; and (b) the lead reinsurer, St. Paul, "had the chance to requote" this account but declined to do so. (Ex. G at ALEA 00009248).

84.    The broker, apparently attempting to persuade Equus Re to accept this unfavorable submission, suggested that "[Equus Re] not tell the Syndicate that [it] will not write it but [rather] purchase a reinsurance leaving no exposure for [Equus Re's] share." Recognizing that "[t]his is not the norm for doing business," Equus Re nevertheless agreed to reinsure this account in exchange for obtaining "an in road with the Syndicate" and a promise that Lumbermens "can visit and go through [the Syndicate's] business." (Id.)

85.    In soliciting Equus Re's participation on the Houston Casualty Property Quota Share (Ex. H) account, Houston Casualty ("HCC") provided information to Equus Re on accounts that had generated significant losses. (Ex. H at ALEA 00066348.) After reviewing this information, Equus Re drafted a letter dated December 31, 1998 stating:

> Regrettably, after reviewing all of the information ... we have decided not to authorize on this premier cedent's program this year.   We hope one day though to enter into a partnership

-24-

arrangement with them via you if you provided future opportunities to do so.

(Ex. H at ALEA 00066346.) The letter continued by listing seven different "reasons for passing" on this risk, including "[l]ack of term changes after recent poor results" and "[i]nsufficient potential margins for reinsurers on a catastrophe exposed portfolio." (Id.)

86.     However, even though this letter was signed by Larry Lochner of Equus Re, a handwritten notation on the top of the letter indicates it was "never sent." Instead, Equus Re sent a different letter, also dated December 31, 1998, which stated:

> Thank you for your recent additional information regarding HCC's actions on accounts with attritional losses. . . . Though, we would have preferred additional changes, we are prepared to make a commitment to HCC this year providing they are willing to do the same with us. Specifically, we wish to have the opportunity to review for a potential participation all of HCC's reinsurance programs as they come up regardless of placing broker or [line of business] (Marine, Aviation, A&H Lendors Single Interest, etc.). We have always respected HCC's opportunistic business approach and its management team and would seek to become one of its core reinsurers in the future. If HCC is willing to provide us with such a business showing, we are prepared to offer them a 5% line at 1/1/99.

(Ex. H at ALEA 00066345). Thus, it appears that Equus Re specifically adopted an underwriting approach that was the very opposite of what it had represented to me. On the very same day that at least certain Equus Re officials concluded that this risk should be rejected on its merits, Equus Re decided to accept the risk in order to ingratiate itself with HCC and "become one of its core reinsurers in the future."

87.     Equus Re initially declined the Hiscox Syndicate (Ex. I) account because it concluded "this was too low an attachment [point]." However, the co-broker, Guy Carpenter asked Equus Re to reconsider its decision – not because of the characteristics of the account itself – but "as part of [an] overall relationship with the Group (Syndicate and Insurance Co.)." In

response, Equus Re offered to take a 10% line and reinsure the account. (Ex. I at ALEA 00020237.)

88.     Equus Re's underwriting notes for the <u>Euclidian Syndicate</u> (Ex. J) account reveal that it concluded that the offered rate was "thin" on this new property account, and that it "would not renew next year unless the price changed." (Ex. J at ALEA 00023622.) Notwithstanding its apparent dissatisfaction with the rate offered for this risk, Equus Re agreed to accept it, "presum[ing] that we hope to get other opportunities from the Syndicate."

89.     The <u>Caliber One</u> (Ex. K) account represents yet another instance of Equus Re's agreement to accept business that was below its underwriting standards in exchange for future considerations. Equus Re's underwriter's notes provide in pertinent part:

> "As the file states clearly in several places, we did not intend to offer a line on this cover . . . . Our main reason was that the book was basically catastrophe exposed underpriced National Accounts business. This fact has not changed." (Ex. K at ALEA 00071231.)

> "We declined this cover several times to the broker due to our dissatisfaction with the current pricing of primary large account business and the high level of exposure to EQ and wind that is inherent to these accounts." (Ex. K at ALEA 00071232.)

Aon, the broker for the account, appealed to Equus Re to reconsider its opinion. Equus Re continued to believe that the account was not attractive, but decided to write it as an "accommodation" to Aon's Boston office, a "major supporter of Equus' property department" and with which Equus Re saw "a strong future ... relationship." (<u>Id.</u>)

90.     No one on the PXRE Pre-Binding Audit team discovered any of the documents attached as Ex. F through K. (Ex. O, Mayer Aff. ¶ 65, Ex. P, Yenke Aff. ¶ 21.) Nor did anyone at PXRE discover any other document similarly indicating that Equus Re was compromising its stated underwriting standards for the apparent purpose of accepting certain risks as "loss leaders"

-26-

in the hope of a future payoff from brokers or ceding insurers. (Ex. O, Mayer Aff. ¶ 65, Ex. P, Yenke Aff. ¶ 21.)

91.     The Lexington/Thor Side Agreement (Ex. F), standing alone, would have dissuaded PXRE from recommending to PXRE management that PXRE enter into the Retro Treaty transaction. (Ex. O, Mayer Aff. ¶ 66.)  By accepting a known loss generating contract, apparently for the purpose of assisting a ceding company to shift a loss from one accounting period to another (through the guarantee of a future profit to Equus Re), Equus Re apparently violated the norms and standards of the reinsurance industry.  If PXRE had known of the Lexington/Thor Side Agreement, it would have created a serious doubt about all of Equus Re's representations and statements – in particular, its "strategic and operational tenets," its "disciplined and controlled underwriting," and its ethical and accounting controls.  PXRE would not have wanted to participate in a business that had engaged in such conduct, and the Retro Treaty never would have been bound. (Ex. O, Mayer Aff. ¶ 66.)

92.     The same holds true for the other transactions identified above.  Together with the Lexington/Thor Side Agreement, these exhibits reveal a pattern of conduct that was blatantly and completely inconsistent with Equus Re's statements and representations about its underwriting approach and methodology described above.  If PXRE had known that Equus Re had repeatedly engaged in such "loss-leading"-based underwriting rather than the approach it had represented, PXRE would not have bound the Retro Treaty. (Ex. O, Mayer Aff. ¶ 67.)

93.     PXRE would not have wanted to enter into a transaction with a company that had engaged in a pattern of conduct that was inconsistent with its statements and representations. (Ex. O, Mayer Aff. ¶ 68.)

94.     In any event, PXRE would have no interest in a book of business that was based on loss-leading rather than "disciplined, controlled underwriting." (Ex. O, Mayer Aff. ¶ 69.)

95.     Because the loss-leading-based underwriting approach adopted by Equus Re involved a trade-off of losses today for a payoff in future years, a serious question would have emerged about whether the Retro Treaty transaction was an effort to offload the money-losing contracts entered into in order for the Equus Re personnel to build relationships with brokers and ceding insurers, while these same individuals would be reaping the benefits of these relationships when they continued their business at Alea. (Ex. O, Mayer Aff. ¶ 70.)

96.     Lumbermens emphasized the Tillinghast Report as a "positive point" for PXRE to consider, when the facts suggest that Lumbermens knew that report was inaccurate. (Ex. O, Mayer Aff. ¶ 71.)

97.     It simply would not have been reasonable, feasible, or consistent with standard industry practice for PXRE to read each and every document in the Protected Portfolio. Because of the practical and economic considerations involved in pre-binding audits and document reviews, reinsurers as a general matter: (a) rely heavily upon the statements and representations made by ceding companies in the placement of reinsurance transactions; and (b) rely upon the ceding company to make affirmative disclosures of information which reasonable reinsurance underwriters would find material to their evaluation of the risks. PXRE followed this approach in connection with the Retro Treaty transaction. (Ex. O, Mayer Aff. ¶ 73, Ex. P, Yenke Aff. ¶ 17.)

98.     Thus, it would only have been by luck or happenstance – akin to finding a "needle in a haystack" – for the PXRE team to have found amid the hundreds of thousands of pages in the Protected Portfolio files the documents referenced above, which establish that Lumbermens' representations were false and misleading. (Ex. O, Mayer Aff. ¶ 75.)

99. It would not have been reasonable for PXRE to discover these materials in the post-binding claim audits conducted after the Retro Treaty was executed in April 2000. (Ex. O, Mayer ¶ 76, Ex. P, Yenke ¶ 18.)

100. In addition, the post-binding audits had a completely different purpose, scope and focus than the Pre-Binding Audit discussed above. The Pre-Binding Audit involved a team of individuals who conducted interviews and reviewed underwriting files (i.e., the documents analyzing, evaluating and quantitatively assessing whether Equus Re would take on a risk). It was in those underwriting files that the documents in Exhibits F-K were found. (Ex. O, Mayer ¶ 77.)

101. The post-binding claim audits, however, were only staffed with one or two individuals from PXRE and were focused on claim files (i.e., claims being submitted by ceding insurers pursuant to the reinsurance contracts in the Protected Portfolio). (Ex. O, Mayer ¶ 78.)

102. An August 7, 2000 e-mail from Carey Stone of Lumbermens to PXRE (Ex. L) which allegedly makes reference to the side agreement between Equus Re and Lexington on the Thor account. The August 2000 e-mail mischaracterizes the fundamental nature of the Thor Side Deal: For example, it states that "in exchange for priorities to use Equus on two other programs (which also turned out to be bad, but not as bad), Equus agreed to write a 25% share." (Ex. L at PXRE 006420.) However, the true nature of the Thor Side Deal, as set forth in Carol Correia's December 21, 1998 memo, was that Lumbermens was to continue being "paid back" through cessions of future Lexington business until it reached a 10% profit margin on that business, at which time the arrangement would be automatically commuted. (Ex. F)

103. Moreover, Ms. Stone's e-mail further notes with respect to the Lexington/Thor program that:

[Equus] have not received their share of [the] premium, and have written back asking a lot of questions. It appears AIG [Lexington] may owe substantially more premium and/or Equus may not own all this (sic) losses.

[W]e agreed that both Dan [Anelante] and I would query London contacts to attempt to get more information on this program. Meanwhile Equus is withholding all payments until questions are answered.

(Ex. L at PXRE 006420.)

104.    This suggested to PXRE that Carey Stone was as mystified as PXRE as to the reasons for the poor performance of the Thor account. If she had reviewed the underwriting file, she would have seen and been able to report to us that Equus Re accepted a known loss-generating deal, back-dated the contract, and was guaranteed a future reward on unrelated business. (Ex. O, Mayer Aff. ¶ 83.)

105.    Furthermore, Cary Stone's cover e-mail to PXRE, which encloses the report upon which Lumbermens relies, states that "based on our conversation I am sending around the attached draft of a report at Kemper, can finalize the [underwriting] piece when you get to it. Per our conversation nothing alarming seen" (Ex. L at PXRE 006416; emphasis added).

106.    Additional correspondence between Lumbermens and PXRE regarding the Thor account is also relevant. For example, on April 21, 2000, Ms. Stone wrote to Mr. Wachter, enclosing a claim report on Lexington/Thor she received from Alea. (Ex. M at PXRE 002331). Ms. Stone noted that "the report finds some fault with the [claims] handling, but it appears is now being controlled and corrected, and there is nothing I see here that would give us any right to refuse coverage under our treaty. Tom Daly [of Alea] told me, and I agree that this appears to be a poor business result, but covered." In addition to the claims report, Ms. Stone enclosed a letter to her from Tom Daly of Equus Re, who noted with respect to this contract:

there were no smoking guns found from a claims handling perspective. In addition, I don't believe the performance of a